ATTORNEY FOR APPELLANT
Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court



FILED
Feb 18 2016, 1:21 pm

CLERK
of the supreme court,
court of appeals and
tax court

No. 02S04-1602-JT-93

IN RE THE TERMINATION OF THE PARENT-
CHILD RELATIONSHIP OF V.A. (Minor Child),
and

A.A. (Father),

*Appellant (Respondent below),*

v.

INDIANA DEPARTMENT OF CHILD SERVICES,

*Appellee (Petitioner below).*

Appeal from the Allen Superior Court, No. 02D08-1307-JT-80
The Honorable Charles F. Pratt, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 02A04-1405-JT-233

**February 18, 2016**

**RUCKER, Justice.**

In a joint proceeding the trial court terminated the parental rights of Mother and Father to their daughter concluding there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied and that termination is in the child's best interests. Determining the evidence in this case does not clearly and convincingly support termination of Father's parental rights, we reverse the judgment of the trial court.

## Facts and Procedural History

In 2012, S.A. ("Mother") and A.A. ("Father") (sometimes referred to as "Parents") were married and lived together raising their then-two-year-old daughter, V.A. In July 2012, Mother contacted the Allen County office of the Indiana Department of Child Services ("DCS") expressing concerns of being overwhelmed in caring for V.A. (sometimes referred to as "Child"). DCS involvement revealed that Mother had untreated mental health issues that prevented her from properly caring for her child. At the time, Mother was V.A.'s primary caretaker while Father was at work. After several weeks of working with the parents, DCS eventually removed V.A. from the home of Mother and Father and placed her into foster care. At a December 3, 2012 fact-finding hearing, the trial court determined that Mother suffered from schizo-effective disorder.[1] V.A. was adjudicated a Child in Need of Services ("CHINS") and a dispositional hearing was held. The dispositional decree included a Parent Participation Plan for Father and Mother with the goal of reunification. V.A. remained in foster care under the dispositional decree while Parents worked towards reunification. At a July 31, 2013 permanency hearing, the trial court adopted DCS' petition to change the Plan to termination of parental rights. On April 28, 2014, following a four-day termination hearing,[2] the trial court issued a joint Order terminating the parental rights of both Father and Mother.

---

[1] No one disputes that Mother is suffering from mental illness. According to psychiatrist Dr. Ahmad Hani, Mother's records indicated that she had two prior diagnoses: (1) mood disorder NOS ("not otherwise specified"), which is "a diagnosis meaning a person has some type of mood disorders [sic] but not clearly what kind of mood disorder;" and (2) psychotic disorder NOS, which is used if there is a concern that the individual may be suffering from paranoid schizophrenia but it is too soon to make a conclusive determination. Tr. at 369. Dr. Hani had not changed the diagnosis when he last saw Mother in October 2013. Tr. at 369.

[2] The termination hearing was conducted on the following dates: December 18, 2013; January 7, 2014; January 28, 2014; and January 29, 2014. Father was represented by counsel at each proceeding.

Father appealed challenging the trial court's conclusion that "there is a reasonable probability the conditions necessitating V.A.'s removal will not be remedied." Br. of Appellant at 10. Father also challenged "any finding or inference made by the trial court which determined that there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the wellbeing of V.A." Id. Lastly, he contended "the State failed to prove that termination was in the best interests of the child . . . ." Id. at 7. In a Memorandum Decision the Court of Appeals rejected Father's claims and affirmed the trial court's judgment. See In re V.A., No. 02A04-1405-JT-233, at *11-14 (Ind. Ct. App. Dec. 18, 2014). We now grant Father's transfer petition and reverse the judgment of the trial court.[3] Additional facts are set forth below as necessary.

**Standard of Review**

In reviewing whether the termination of parental rights is appropriate "we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences that are most favorable to the judgment and give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. Id. (quoting Tr. Rule 52(A)). "We will set aside the trial court's judgment only if it is clearly erroneous." Bester v. Lake Cty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). In order "to determine whether a judgment terminating parental rights is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." In re I.A., 934 N.E.2d at 1132.

---

[3] Our determination in this regard applies to Father only. Mother did not contest the trial court's judgment and is not a party to this appeal.

## Discussion

## I.

Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights of a child in need of services must allege:

(A) that one (1) of the following is true:

    (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii)    The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

The State is required to prove that termination is appropriate by a showing of clear and convincing evidence. In re G.Y., 904 N.E.2d 1257, 1260 (Ind. 2009). This is a higher burden than establishing a mere preponderance. Id. at n.1. As this Court has previously explained:

> In ordinary civil actions a fact in issue is . . . sufficiently proved by a preponderance of evidence. However, clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this *high standard* is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals to prove willful, wrongful and unlawful acts to justify an exceptional judicial remedy . . . .

Estate of Reasor v. Putnam Cnty., 635 N.E.2d 153, 159-60 (Ind. 1994) (omissions in original) (emphasis added) (quoting Travelers Indem. Co. v. Armstrong, 442 N.E.2d 349, 360 (Ind. 1982) (quotation omitted)); accord J.C.C. v. State, 897 N.E.2d 931, 934-35 (Ind. 2008). This heightened standard is of particular import within the context of termination proceedings because "the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." In re Adoption of O.R., 16 N.E.3d 965, 972 (Ind. 2014) (citing Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35 (1925); Meyer v. Nebraska, 262 U.S. 390, 399 (1923)).

"[T]he parent-child relationship is one of the most valued relationships in our culture." Neal v. DeKalb Cty. Div. of Family & Children, 796 N.E.2d 280, 285 (Ind. 2003) (quotation omitted). And a parent's interest in the upbringing of his or her child is "perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s]." Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality op.). Therefore, the certainty of a trial court's decision to terminate a parent's parental rights to his or her child is paramount. As the United States Supreme Court has elaborated:

> When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. "If the State prevails, it will have worked a unique kind of deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one."

5

Santosky v. Kramer, 455 U.S. 745, 759 (1982) (quoting Lassiter v. Dep't of Soc. Servs. of Durham Cty., 452 U.S. 18, 27 (1981)). That is not to say that a reviewing court may reverse a trial court's judgment based on a belief that the parent-child relationship should be preserved and support that determination by rummaging through the record to obtain evidence that *may* support the denial of a petition to terminate. To be sure, on review our analysis is centered on the findings of fact and conclusions of law determined by the trial court. See In re I.A., 934 N.E.2d at 1132. Nevertheless, in following the Supreme Court's admonition to apply a heightened standard of proof in termination cases, we must be mindful that "a standard of proof loses much of its value if a reviewing court does not apply sufficient scrutiny to enforce it." Karen A. Wyle, Fundamental Versus Deferential: Appellate Review of Terminations of Parental Rights, 86 Ind. L.J. Supp. 29, 37 (2011). And where the trial court's judgment demonstrates clear error our appellate authority permits us to reverse. See Tr. R. 52(A) ("On appeal of claims tried by the court without a jury . . . the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.").

## II.

The trial court determined DCS proved that the requirements of Indiana Code section 31-35-2-4(b)(2)(B)(i)—that there is a reasonable probability that reasons that brought about the child's placement outside the home will not be remedied—was satisfied. The trial court also found that termination was in V.A.'s best interests. Specifically, the trial court made the following conclusions as it relates to Father:

> 2. . . . By the clear and convincing evidence the court determines that there is a reasonable probability that reasons that brought about the child's placement outside the home will not be remedied. . . . [Mother] and the Father have little recognition if any of her mental illness. Both are not supportive of the medicinal regimen she requires to maintain her health and, in turn, safely provide for a small child. The Father has been afforded the option of separately providing for the child. However, he has chosen, instead, to remain with his wife. He does not have the support or ability to provide the level of supervision required to ensure the child's safety when in the company of her mother. He is unwilling and incapable of

> ensuring that the Mother has no unsupervised contact with the child while she refrains from following her required mental health care. The circumstances today are the same as that which existed at the time of the Preliminary Inquiry and CHINS adjudication.
>
> 3.  . . . The child needs a safe [sic] stable and nurturing home environment. The child has suffered emotional turmoil during visitations with her parents. The child has not been able to be safely placed back into the care of either parent and their supervised visits continue. The child needs a safe, sustainable [sic] nurturing environment that parents are unable to provide. By termination of parental rights the child can be freed for adoption. The same serves her best interests.

App. at 16-17 (Order at 7-8, ¶¶ 2-3). We will address each in turn.


### A. Remediation of Condition.


Father first challenges the sufficiency of the evidence supporting the trial court's determination that "there is a reasonable probability the conditions necessitating V.A.'s removal will not be remedied." Br. of Appellant at 10. We engage in a two-step analysis to determine whether there is clear and convincing evidence to show that the conditions that led to V.A.'s placement outside of the home will not be remedied. "First, we must ascertain what conditions led to [her] placement and retention in foster care. Second, we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" In re K.T.K., 989 N.E.2d 1225, 1231 (Ind. 2013) (quoting In re I.A., 934 N.E.2d at 1134). "Clear and convincing evidence need not reveal that the continued custody of the parent[] is wholly inadequate for the child's very survival." Bester, 839 N.E.2d at 148 (quotation omitted). It is certainly true that the State may meet its burden when it proves "by clear and convincing evidence that 'the child's emotional and physical development are threatened' by the respondent parent's custody." Id. (quoting Egly v. Blackford Cty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1234 (Ind. 1992)). See, e.g., In re K.T.K., 989 N.E.2d 1225 passim (finding the State met its burden when the record revealed that "Mother was seen passed out in a vehicle with her infant son K.C. and required assistance getting out," "Mother continued to use drugs and failed to cooperate with the recommended services," "Mother's prior, habitual pattern of substance abuse and criminal conduct resulted in continued

7

neglect of the Children," "Mother's drug problems were not recent but had lasted through the duration of the Children's lives," "Mother has a criminal mentality that manifests itself in disregard for the law," son felt that "it was a bad life," and daughter "did not feel safe with Mother [and] fell into a fire pit when she believe[d] that her mother was supposed to be watching her" (internal quotations omitted)). But the constitutional guarantees of the Fourteenth Amendment and the heightened burden requirements of our state statutes dictate that such determination must be founded on factually-based occurrences as documented in the record—not simply speculative or *possible* future harms.

> i. *Conditions resulting in Child's removal.*

The trial court found that V.A. was removed from her parents' custody and made a ward of the State for the following reasons:

> Mother advised that she was overwhelmed by the child and wanted her removed. . . . Mother was verbally hard to follow and expressed unrealistic behavioral expectations of the child. The Mother expressed a belief that people were trying to read and control her mind over the [I]nternet. She was unwilling to follow a behavioral plan and *the Father was unwilling to live separate from the Mother*. Accordingly, the child was removed from their care.

App. at 10 (Order at 1, ¶ 3) (emphasis added). With respect to Mother these findings are clearly and convincingly supported by the record. But, the only reason directly attributable to *Father* is that he "was unwilling to live separate from the Mother." It is common practice for our trial courts to conduct termination hearings as well as the CHINS proceedings underlying them involving multiple children and/or multiple parents in a single proceeding. However in order to determine whether there is a reasonable probability that the conditions necessitating V.A.'s removal will not be remedied such that termination of *Father's* rights is warranted, we must consider only those reasons attributable to Father. See In re I.A., 934 N.E.2d at 1134 ("To hold [Father] liable for the conditions that resulted in [Child's] removal would be to hold [Father] liable for the actions of [Mother]." (alterations in original) (quoting In re B.D.J., 728 N.E.2d 195, 201 (Ind. Ct. App.

8

2000))). And as the conclusions in this case illuminate and the trial court's findings reveal, the termination order focused primarily upon Mother's conduct and how her conduct affected Child.

As the testimony from DCS Caseworker Sara Drury—upon which the trial court relied—reveals, at the time DCS became involved, Mother was V.A's primary caretaker while Father was at work. Father did not want his daughter removed from his care and "was willing to do whatever needed to try to keep V.A. in their home at that time." Tr. at 125. According to Drury, Father complied fully with the safety plan that DCS put in place. He followed the referral and participated in Daybreak Services, which offered alternative child care solutions to prevent V.A. from being alone in Mother's care. Additionally, Father was assisted by "other caregivers that were in place as part of the safety plan." Tr. at 137. Drury testified that "the safety plan that [was] put in place was sufficient to leave the child in the home." Tr. at 136. This plan worked successfully "[f]or over a month." Tr. at 129. Even though Mother's mental health continued to be of concern, "the immediate safety concerns . . . were addressed." Tr. at 137. Nevertheless, because DCS did not feel that "[Mother] was capable at that point of caring for the child,"[4] Tr. at 138, Father was informed that if he did not "make the decision to have [Mother] leave," Tr. at 131, DCS would decide to remove V.A. from Father's custody and place her in foster care. "He was told prior to going to court by both [Drury] and [her] supervisor that he was most likely going to have a choice to make and that it wasn't a fair choice for him but that he was probably gonna [sic] have to choose between his wife and his child because *we did not feel that they could both remain in the home*

---

[4] This testimony was corroborated by DCS Family Case Manager Andrea Hoy and this point is conceded by the State. Hoy testified that "V.A. [was] removed from her parents . . . [d]ue to [Mother's], um, mental state at the time. . . . [T]hey were residing in a hotel room, um, that wasn't up to par. It was, um, minimal standards. Um, she was frustrated with, um, the child constantly crying, um, and she was irritated with the neighbors surrounding her." Tr. at 391. On appeal, the State claimed:

> DCS substantiated neglect against Mother . . . . However, DCS did not remove Child at this time, but provided Parents with services and instituted a safety plan that Mother would not be alone with Child. The safety plan included [P]arents participating in Daybreak Services, Homebuilders, and not allowing Child to be alone with Mother. DCS removed Child from the home on August 22, 2012, due in part to Mother's unwillingness to follow the safety plan, Mother's behaviors at the preliminary inquiry hearing— and *Father's unwillingness to live separately from Mother*.

Br. of Appellee at 2-3 (emphasis added) (internal citations omitted).

*together safely*." Tr. at 130 (emphasis added). At the time of the termination hearing, Father continued to reside with Mother in the three-bedroom home that Father rented with the option to buy, which he was able to move into as a result of the recommended services from DCS provided by Homebuilders.

Although this evidence clearly and convincingly supports the finding that rather than separating from his spouse, Father "has chosen, instead, to remain with his wife," App. at 17 (Order at 8, ¶ 2), Father's unwillingness to live separately from a mentally ill spouse, without more, is an insufficient basis upon which to terminate *his* parental rights. As our courts have long held: "Mental [disability] of the parents, standing alone, is not a proper ground for terminating parental rights." Egly, 592 N.E.2d at 1234 (citing Ind. Code § 31-6-5-4(c) (1990); Matter of Dull, 521 N.E.2d 972, 976 (Ind. Ct. App. 1988) ("find[ing] that retardation of a parent *by itself* is not a ground for termination of parental rights" (emphasis in original) (citations omitted))); but see R.W., Sr., v. Marion Cnty. Dep't of Child. Servs., 892 N.E.2d 239, 249, 248 (Ind. Ct. App. 2008) (affirming termination of Mother's and Father's parental rights not only due to "Mother's refusal to take readily available steps to bridge the communication gap caused [by her disability, which] seriously hindered Mother's ability to effectively care for her children" but concluding that "[i]n addition to not being able to appropriately supervise the children, [both parents] fail[ed] to complete home-based services, and fail[ed] to improve their ability to effectively communicate with each other, . . . [and] the parents had also not achieved the dispositional goal of securing and maintaining a safe and stable home"); R.G. v. Marion Cty. Office, Dep't of Family & Children, 647 N.E.2d 326, 330 (Ind. Ct. App. 1995) (properly considering the parents' mental disabilities as a factor in affirming the termination of parental rights for mentally impaired parents and concluding that termination was appropriate because "Mother and Father ha[d] been both unable and unwilling to develop the skills necessary to fulfill their legal obligations as a parent"), trans. denied.

Because we have long found the custodial parent's mental disability to be an insufficient basis for termination, we fail to see how simply living with a relative suffering from mental illness provides a more satisfactory basis for termination. And this is particularly so here since the trial court did not find, and the record does not support, that V.A. had been abused by Mother during the time that she was in her Father's custody. In fact, as Drury testified, the very reason that DCS

became involved was because Mother contacted them "reporting that she was feeling very overwhelmed with V.A. and caring for V.A. She was requesting assistance." Tr. at 122.

### ii. *Reasonable probability that reasons will not be remedied.*

In determining there is a reasonable probability that the conditions that led to removal will not be remedied, the trial court declared: "Father ha[s] little recognition if any of [Mother's] mental illness. Both are not supportive of the medicinal regimen she requires to maintain her health and, in turn, safely provide for a small child." App. at 16 (Order at 7, ¶ 2). We note however, "the factors identified by the trial court as conditions that will not be remedied are relevant only if those conditions were factors in DCS' decision to place [the child] in foster care in the first place." In re I.A., 934 N.E.2d at 1134. And where, as here, the trial court did not find that Father's "little recognition if any of [Mother's] mental illness" was a factor in DCS' decision to remove V.A. from the home we do not believe it to be an appropriate basis to support the conclusion DCS has met its heightened burden to show by clear and convincing evidence that termination is appropriate here.

In concluding that DCS met its burden in this regard, the trial court reasoned:

> 2. . . . Father ha[s] little recognition if any of her mental illness. Both are not supportive of the medicinal regimen she requires to maintain her health and, in turn, safely provide for a small child. . . . He does not have the support or ability to provide the level of supervision required to ensure the child's safety when in the company of her mother. He is unwilling and incapable of ensuring that the Mother has no unsupervised contact with the child while she refrains from following her required mental health care.

App. at 16-17 (Order at 7-8, ¶ 2). We begin by observing that Father never testified that he is unwilling to ensure that Mother has no unsupervised contact with the child while she refrains from following her required mental health care. Nor did the therapists with whom Father counseled testify that he is incapable of the same. Although the evidence is clear that Mother provided unsupervised care to V.A. prior to DCS involvement, as previously explained, Drury testified that Father complied fully with the safety plan that DCS put in place and it worked until DCS elected

11

instead to remove V.A. from Father's care. See Tr. at 127-29, 136-37. Thus, based on our review of the record, we are persuaded the trial court's contrary finding is erroneous.

Next, there is no dispute that Mother's untreated condition prevents her from providing unsupervised care to her child. But Mother's inability to safely provide for a small child should have no bearing on our determination as to whether the trial court properly concluded that *Father's* care is insufficient. To the extent the trial court's conclusion is meant to imply that Father's lack of understanding regarding Mother's mental health demonstrated that Father would place V.A. in jeopardy of physical harm, such an inference is not clearly and convincingly supported by the record. Other than concerns expressed by therapists and DCS case managers based on generalized behaviors of individuals suffering with psychotic disorders,[5] there is no evidence that *this* mother has acted in a way that resulted in or created a substantial risk of physical harm to V.A. Consequently, Mother's mere presence in the home—without more—is insufficient. Instead, the findings by the trial court reflect the normal, yet unfortunate, challenges endured by any family caring for a relative with mental health issues, such as a grandparent suffering from Alzheimer's, a sibling battling impulse control disorder, or even a parent returning from a tour of duty and experiencing post-traumatic stress disorder.

The trial court found that Father "cannot physically protect the child when with the Mother" based on Beth Webber's testimony—the court appointed *Guardian ad litem*. App. at 16 (Order at 7, ¶ 32). Webber testified that she only interacted with the parents "[a]t Court or in facilitation, in more formal kinds of settings [and] ha[d] not attended a case conference in this

---

[5] As the trial court found, Dr. Ahmad testified as to the *possible* effects that could result from Mother's condition without the proper medication. The trial court did not find, and the record does not support, that Mother posed a direct risk to herself or others around her. See App. at 14 (Order at 5, ¶ 20) (finding that Dr. Ahmad "opined that a psychotic break *could* result . . . and [she] *could* harm herself or others, including a child"). Accord Id. at 14-15 (Order at 5-6, ¶ 21) (finding that in spite of the fact that while unmedicated Mother admitted herself into a women's shelter and locked herself in a small room while there, resulting in her expulsion from the center, the responding police officer escorted her from the property but instead of taking her to a hospital or mental health facility, he "transported [her] to a home that she advised was the residence of her relatives" and "assured [Father] that his wife was safe" when Father presented at the police station looking for her). Similarly, based on the testimony of Park Center Clinical Nurse Specialist Karen Lothamer, the trial court found that "if the Mother is not on her properly prescribed medications a child in her care would be at risk." Id. at 13 (Order at 4, ¶ 14). The trial court did not find nor does the record support the conclusion that a child in Father's care, *albeit* with Mother present, would be at risk.

12

case." Tr. at 444-45. Her knowledge of Father's interaction with V.A. was based on her review of the reports and documents regarding the case, specifically the reports of Father's visits with V.A. at SCAN.[6] Tr. at 444-47. Based on these reports Webber reasoned, "so long term on a twenty-four-seven (24/7) three hundred sixty five (365) day a week [sic] situation, [Father] could not be effective that [sic] keeping his child emotionally safe and physically safe, um, with [Mother] not addressing her mental health issues." Tr. at 447. Although Webber expressed her concerns regarding Mother's behaviors and Father's ability to respond to them, the record does not support the conclusion that he lacked the ability to *physically* protect his child. Rather, the record reveals there is only one instance involving a physical altercation with Mother, which occurred during a visit at the SCAN facility at a time in which neither Father nor the SCAN therapist was able to redirect Mother's psychosis before she erupted and responded physically towards *him*. After which, Father escorted Mother out of the building where the visit was being conducted, leaving his daughter in the care of the SCAN supervisor, Robin James, until her foster mother arrived. The benefit of hindsight suggests that it might look more favorably upon Father to have continued his visit with his daughter leaving someone else at the SCAN facility to deal with Mother, but that is a far cry from clearly and convincingly establishing that Father would fail to protect his daughter from physical harm in the future.

Further, the trial court's finding that Father lacks the ability to provide the level of supervision required to care for V.A. and supervise her when in the company of her mother "is tempered by the fact that these services were not available to [him]," In re G.Y., 904 N.E.2d at 1263, or required under the Parent Participation Plan. With respect to the required counseling or educational services, Father's Parent Participation Plan included the following:

> m. Seek advice and education regarding wife's mental illness and possible effect on children *from therapist or other experts provided by [DCS]*.

---

[6] SCAN, Inc. provides supervised visitation services for families referred by DCS and mediates the visits between children who have been removed from their home and their parents. Visitation Faciliation, SCAN, https://www.scanfw.org/visitationfaciliation/ (last visited Feb. 2, 2016). The services are designed in this way to ensure that the children remain in a safe environment and to teach the parents coping skills in dealing with their children. Id. These visits may occur at a SCAN office, at a client's home, or in a public location. Id.

> n. Enroll in therapeutic home based services program through Bowen Center, participate in all sessions, and successfully complete the program. (Masters Level Services)

App. at 12 (Order at 3, ¶ 8). Although Father's Parent Participation Plan provides that he must "seek advice and education" and "enroll in therapeutic home based services" the record reflects that the referrals made to service providers from DCS were for Mother—not Father. For example, Erin Christy provided in-home skill building services to Mother and Father between November 2012 and April 2013 during which Father actively participated in the parenting sessions. Christy testified that the referral that she received "was listed as – just as [Mother]." Tr. at 329. Still, Christy stated that Father successfully completed the parenting skills building services that she provided. See Tr. at 329 (responding: "Yes," when asked, "did they successfully complete the parenting skills building?"). Additionally, the trial court found that Father and Mother began counseling with Andrew Liechty at the Bowen Center.[7] Liechty counseled Parents for approximately seven months during the latter part of 2013, during which time Father actively participated in the sessions. Liechty testified as follows: "They were to work with me on marital relationship, parenting skills, they were also improving an understanding of the mental health condition that [Mother] has been diagnosed with." Tr. at 221. Regarding the counseling with Father, he elaborated: "The only goal that we have intently focused upon has been marital relationship and they have demonstrated and reported progress in their relationship." Tr. at 223. Concerning the counseling or education offered to Father for Mother's mental health condition, Liechty testified, "I have not discussed it with [Father]." Tr. at 224.

It is clear that Father complied with the court ordered case plan for reunification with regard to the required counseling and therapy services offered by DCS. Absent some indication that

---

[7] Parents were first seen at the Bowen Center by outpatient therapist Ashley Radtke. Radtke testified that Mother was her only client and referred to her for both individual and family counseling. She explained that Mother would not consent to the recommended individual counseling, but would agree to the marital counseling, which would include Father and thus necessitate his participation in Mother's counseling sessions in which he willingly participated. See Tr. at 304-05. Radtke testified that she never addressed with Father the impact of medication on Mother's mental health. See Tr. at 315. Based on Radtke's testimony, the trial court found: "Through-out the therapy the Father was in a continued state of trying to correct and understand the Mother." App. at 14 (Order at 5, ¶ 15). And according to Radtke, this behavior of "trying to get through and reasoning [with Mother,] that's a good thing." Tr. at 318. Sometime thereafter, the case was transferred from Radtke to Liechty.

14

Father was specifically directed to show the "support or ability to provide the level of supervision required to ensure the child's safety when in the company of her mother," App. at 17 (Order at 8, ¶ 2), "he cannot now be criticized for not doing that which he was never asked to do." Bester, 839 N.E.2d at 149.

Also, as it relates to the trial court's finding that Father is not supportive of the medicinal regimen Mother requires to maintain her health, the Order contains several findings demonstrating that Father accompanied Mother on her visits to healthcare providers—thus, clearly reflecting that Father supported Mother's need for therapy. Therefore, the trial court's assessment must be inferred from the finding that "Father was supportive of what the Mother wanted but not what she needed." App. at 13 (Order at 4, ¶ 14). But Father cannot be held accountable here for failing to convince Mother to take her recommended medications—something that the DCS' appointed psychiatrist was unable to do.

## B. Best Interests of the Child.

Finally, Father challenges the trial court's conclusion that termination is in V.A.'s best interests. The trial court reasoned that V.A. "needs a safe [sic] stable and nurturing home environment [and] has suffered emotional turmoil during visitations with her parents." App. at 17 (Order at 8, ¶ 3). In so doing, the trial court relied on the *Guardian ad litem*'s recommendation that termination was in V.A.'s best interests. The GAL testified as follows:

> I think in this case [Father] loves his child and loves his wife. Um, and I think it's a terrible situation that he's in. The difficulty is that with them being together, um, and mom un-medicated and not dealing with her mental health issues, um, it puts him in a quandary about how to make sure that [Mother] is appropriate and that the child is safe. And in two (2) hour at a time visits at SCAN he hasn't been able to always do that. Um, SCAN workers have had to redirect, SCAN workers have had to intervene, um, and so long term on a twenty-four-seven (24/7) three hundred sixty five (365) day a week [sic] situation, [Father] could not be effective that [sic] keeping his child emotionally safe and physically safe, um, with [Mother] not addressing her mental health issues. And so because

of those factors, um, we don't have other choices but to terminate
parental rights and give this child a different opportunity."

Tr. at 446-47. But "the right of parents to raise their children should not be terminated solely because there is a better home available for the children." In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." In re I.A., 934 N.E.2d at 1136 (citing In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999) (citation omitted), trans. denied). While it is an unfortunate instance for any child to experience the "emotional turmoil" and difficulties of living with a parent suffering from mental illness, the evidence does not clearly and convincingly establish that the way to serve V.A.'s best interests is to "give this child a different opportunity" by irrevocably severing the relationship she has with Father and making her freed for adoption.[8] The need for permanency is certainly *a* factor in determining whether termination is in the child's best interest. In re G.Y., 904 N.E.2d at 1265. But as we have explained, a child's need for immediate permanency is not reason enough to terminate parental rights where the parent has an established relationship with his/her child and has taken positive steps in accordance with a Parent Participation Plan towards reunification. See, e.g., Id. at 1265-66 (declining to find the "need for immediate permanency through adoption to be a sufficiently strong reason, either alone or in conjunction with the court's other reasons, to warrant a conclusion by clear and convincing evidence that termination of [incarcerated] Mother's parental rights [was in child's] best interests").

---

[8] The trial court expressed that V.A. "has not been able to be safely placed back into the care of either parent and their supervised visits continue." App. at 17 (Order at 8, ¶ 3). However, the import of such finding is minimized by the fact that the trial court did not conclude that continuation of the parent-child relationship between V.A. and her Father poses a threat to V.A.'s well-being. And where, as here, the trial court's findings are based on concerns that Father *may not* be able to simultaneously care for Mother and Child in the same household, we do not believe this a sufficient basis upon which to find that DCS has proven that termination is in V.A.'s best interests. Cf. In re G.Y., 904 N.E.2d at 1265 (reversing termination of Mother's parental rights in part because "continuation of the CHINS foster care arrangement [would not] have much, if any, negative impact on G.Y.'s well-being" "given the highly positive reports about the quality of the placement" where "G.Y. [wa]s under the age of five and Mother's release from prison [wa]s imminent"). This is so especially in a case such as this where the goals of Father's Parent Participation Plan never required this showing.

16

It is important to note the trial court concluded that termination of Father's parental rights serves V.A.'s best interests because she "can be *freed* for adoption." App. at 17 (Order at 8, ¶ 3) (emphasis added). But we reiterate for emphasis, "a parent's constitutional right to raise his or her own child may not be terminated solely because there is a better home available for the child." In re N.Q., 996 N.E.2d 385, 395 (Ind. Ct. App. 2013) (quotation omitted); accord K.E. v. Ind. Dep't of Child Servs., 39 N.E.3d 641, 650 (Ind. 2015) (explaining that "parental rights are not to be terminated merely because there might be a 'better home' available for the child" (quoting In re K.S., 750 N.E.2d at 837)).

Irene Allen, V.A.'s foster mother, testified that V.A. is "welcome to stay in [her] home until a permanent placement is determined for her." Tr. at 217. Case Manager Hoy testified that in the absence of Allen's willingness to adopt V.A. the plan is "[a]doption." Tr. at 419. Thus, it is clear that at the time of the termination hearing, DCS had not yet found an adoptive home for V.A.[9] Consequently, it cannot be the case that relegating V.A. as a permanent ward of the State for an undetermined period of time until a special needs[10] adoptive placement is identified clearly and convincingly shows that termination is in V.A.'s best interests by establishing *permanency*.

Here, the goal of permanency may best be served by allowing V.A. to remain with her current foster family while DCS pursues the goal of reunification with Father as he receives the

---

[9] In 2012, there were approximately twenty-four hundred children in the foster care system in Indiana awaiting adoption. Children's Bureau, U.S. Dep't of Health and Human Servs., Children in Public Foster Care on September 30th of Each Year Who Are Waiting to be Adopted FY 2005-2014 (July 2015), http://acf.hhs.gov/sites/default/files/cb/children_waiting2014.pdf. Of those children, over thirty percent were under the age of five years old. See State Policy Advocacy and Reform Ctr., NACAC State-by-State Adoption Fact Sheets (Fall 2014), http://childwelfaresparc.org/wp-content/uploads/2015/02/Indiana-ADOPTION-FACTS.pdf. The average length of stay in the foster care system for children waiting to be adopted generally exceeds three years. See Id. And according to DCS' most recent report, the total number of adoptions out of DCS care has dropped incrementally over the last three years. Ind. Dep't of Child Servs., DCS Adoption Statistics, http://www.in.gov/dcs/3139.htm (reporting the total number of adoptions between 2012 and 2014 as follows: 2012 – 1,663; 2013 – 1,244; 2014 – 1,038) (last visited Feb. 2, 2016).

[10] According to DCS, a "'special needs child' is: [a] child who is two (2) years of age or older; . . . or, [a] child with a medical condition or a physical, mental, or emotional disability . . . ." Ind. Dep't of Child Servs., Frequently Asked Questions, http://www.in.gov/dcs/2744.htm (last visited Feb. 2, 2016). At the time the CHINS proceeding began, V.A. was already two years old and had turned three when the termination proceedings began.

17

appropriate services that enable him to better understand how to parent his child while simultaneously caring for his mentally ill wife. This is particularly so considering Father has maintained an appropriate relationship with his daughter throughout the CHINS proceedings, provided for her throughout the foster care placement, maintained consistent employment, acquired suitable housing, complied with the requirements that DCS mandated for him in the Parent Participation Plan, and has already taken steps to understand how to better care for Mother's mental health needs.

Of course, the trial court may ultimately determine that Mother's mental condition presents a sufficient danger to V.A. that reunification with Father is not possible while he continues cohabitating with Mother. And this is so regardless of any improvement in Father's understanding of his wife's illness. In that eventuality—where neither termination of parental rights nor reunification appear to be viable options—DCS is not left without a remedy. Our statute governing permanency plans allows for the appointment of a legal guardian for the child "that is intended to be permanent and self-sustaining," as the legal guardian receives the parental rights of "[c]are, custody, and control of the child." I.C. § 31-34-21-7.5(c)(1)(E). Although the current DCS plan is that of adoption, the record is silent on whether the guardianship option was ever considered. In any event, employing that option in this case—should reunification prove unfeasible—would be consistent with our well-established precedent that "involuntary termination of parental rights is an extreme measure that is designed to be used as a last resort when all other reasonable efforts have failed." In re C.G., 954 N.E.2d 910, 916 (Ind. 2011).

**Conclusion**

The evidence in a case involving the termination of a parent's constitutional right to parent his or her child must meet the heightened burden of clear and convincing. The evidence in this case does not meet that burden. We thus reverse the judgment of the trial court and remand this cause for further proceedings.

Rush, C.J, and Dickson, David and Massa, JJ. concur.

18