## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 03 2017, 9:17 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Steven J. Halbert
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Marjorie Newell
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of D.S., Ri.S., Jr., & R.S. (Children) and K.M. (Mother);<br><br>K.M. (Mother),<br>*Appellant-Respondent,*<br><br>v.<br><br>The Indiana Department of Child Services,<br>*Appellee-Petitioner.* | March 3, 2017<br><br>Court of Appeals Case No. 49A04-1605-JT-1125<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn A. Moores, Judge<br>The Honorable Larry Bradley, Magistrate<br><br>Trial Court Cause Nos.<br>49D09-1509-JT-564<br>49D09-1509-JT-565<br>49D09-1509-JT-566 |

**May, Judge.**

[1] K.M. ("Mother") appeals the involuntary termination of her parental rights to her three children, Ri.S., Jr., R.S., and D.S. (collectively "Children"). She raises two issues, which we restate as:

(1) whether the evidence was sufficient to sustain termination of Mother's parental rights; and

(2) whether Mother's due process rights were violated.

We affirm.

# Facts and Procedural History

[2] Ri.S., Jr. was born to Mother and Ri.S., Sr. ("Father")[1] on March 10, 2000. R.S. was born to Mother and Father (collectively "Parents") on September 4, 2001. D.S. was born to Parents on December 14, 2003. On November 1, 2013, police came to Parents' home to serve a warrant for Mother's arrest for theft of a neighbor's electricity. In attempting to serve the warrant, police found Children home alone sleeping on the floor in the front room of a house that was littered with trash and did not have electricity. The police notified the Department of Child Services ("DCS").

---

[1]Father does not participate in this appeal.

[3] DCS Family Case Manager Patrick McCoskey ("FCM McCoskey") went to the home and found it was unsafe for Children. Specifically, FCM McCoskey observed trash in every room, dirty dishes, rotten lettuce, yogurt, and eggs covering the kitchen counters, and trash covering the kitchen floor. There was no refrigerator. FCM McCoskey observed feces in the bathroom toilet and "a brown dirt-like substance covering the bathroom tub." (Ex. at 5.)[2] There was trash in every bedroom and old food scattered throughout the house. There were no beds in any of the bedrooms. Glass crack pipes, a lighter, and cigarettes were on a bedroom floor "in easy reach of the children." (*Id*. at 3.) There was no electricity or heat in the home, and the bathrooms were not functioning.

[4] DCS removed Children from the home that same day. FCM McCoskey interviewed Father and Children regarding their living conditions. DCS attempted to contact Mother that same day but was unsuccessful. Father told FCM McCoskey that Children took sink baths at home and would take regular baths and do laundry at their grandmother's home. When asked about the electricity, Father stated the family had been using a generator for electricity for the past month, but that it had broken two weeks prior and the family had been without power since then. When asked about the crack pipes, Father stated he

---

[2]The trial court clerk's failure to number the pages of the Exhibit volume greatly hindered our review of the record. We cite the page numbers as they appear consecutively in the PDF format of the Electronic Record. *See* Ind. Appellate Rule 29(A) (requiring the Exhibits be filed in accordance with Appendix A(2)(a), which provides: "Each volume of the Transcript shall be independently and consecutively numbered at the bottom. Each volume shall begin with numeral one on its front page.").

did not know to whom they belonged. When asked about Mother's whereabouts, Father stated she was gone when he woke up that morning, he did not know where she was, and he did not know her telephone number.

[5] Ri.S., Jr. told FCM McCoskey that, when he had to use the restroom, he would "go outside to pee or go to his friend's house down the street" but "wasn't sure what the girls do." (*Id.* at 4.) D.S. stated the bathrooms in the home were broken but they used a portable toilet that was a "bucket and chemicals." (*Id.* at 5.) Children all indicated they took "sink baths," (*id.*), at their home and did laundry at their grandmother's house. Children were taken into emergency protective custody and placed with their paternal grandmother ("Grandmother"). DCS tried to contact Mother again on November 3, 2013, but was unsuccessful.

[6] On November 4, 2013, the court held an initial detention hearing. Father appeared but Mother did not appear. DCS filed a petition alleging Children were Children in Need of Services ("CHINS") based on the lack of a safe, sanitary, and appropriate living environment for Children, the open warrant for Mother's arrest, and the drug paraphernalia left within the reach of Children. Children were to remain in Grandmother's care.

[7] On November 15, 2013, the court held a continued hearing. Neither Mother nor Father appeared. DCS indicated service was sent to Mother at her last known address, there was still an open warrant for Mother's arrest, and Mother's whereabouts were still unknown.

[8] On November 22, 2013, the court held a fact finding hearing. Father appeared, but Mother did not appear. At the hearing, DCS reported they were able to contact Mother by telephone, but Mother would not advise DCS of her location due to the active arrest warrant. Father admitted Children were CHINS. The court adjudicated Children CHINS and scheduled a dispositional hearing as to Father. As a result of Mother's absence, the court scheduled a default hearing as to Mother. Children remained in relative care with their Grandmother.

[9] On December 20, 2013, the court held a dispositional hearing for Father. The court found it was in the best interests of Children that they be removed from their home environment and continue in relative care placement. The court ordered Children be formally removed from the home and continue living with Grandmother. Furthermore, the court ordered Father maintain suitable, safe, and stable housing with adequate bedding, functional utilities, adequate supplies of food and food preparation facilities. The court ordered Father undergo home-based counseling, random drug screens, and substance abuse counseling subject to the results of his drug screens. The permanency plan at that time was reunification.

[10] On February 28, 2014, the court held a periodic placement review hearing. Parents did not appear. Grandmother appeared. The court found Father had been unsuccessfully discharged from home-based services and was currently incarcerated for illegal substance use. DCS recounted that its only contact with Mother was the "one time in December [2013] and [Mother] advised that she would not come to Court because she has an open warrant." (*Id*. at 42.)

Grandmother stated Children were doing well in her care and she was willing to keep Children long-term. The court found DCS was making reasonable efforts to offer and provide services, and Children would remain in their current placement. The court ordered the permanency plan remain reunification.

[11] Mother was incarcerated in May 2014. On May 30, 2014, the court held a periodic placement review hearing. Parents did not appear. The court found Mother had been properly served by publication on April 25, 2014, and entered a default disposition order against Mother, formally removing Children from her care. The court also ordered DCS to not provide any services to Mother until Mother "appear[ed] in court or in the Department of Child Services Office to demonstrate a desire and ability to care for [Children.]" (*Id.* at 53.) The court ordered the plan remain reunification.

[12] On September 5, 2014, the court held a periodic placement review hearing. Parents did not appear. DCS reported Mother was in the Madison County Department of Correction ("DOC") and Mother had requested Children be allowed to visit her at the DOC. As DCS had no objection, the court authorized Mother to have visitation with Children at the DOC. DCS requested the court set a permanency hearing as the case had been open roughly ten months. The court set a permanency hearing for December 5, 2014.

[13] Mother appeared before the court for the first time in the CHINS case at a permanency hearing held December 5, 2014. Mother had been released from incarceration earlier that week, was "eager to participate in services," and

requested the court modify its dispositional order to allow Mother to do so. (*Id.* at 62.) Grandmother was present at the hearing and stated Children were "doing well and thriving" in her care. (*Id.*) The court modified its previous disposition order to allow Mother supervised parenting time, homebased therapy, homebased case management, random drug screens, substance abuse assessments, and all other services recommended by DCS. The permanency plan remained reunification for both parents.

[14] On February 27, 2015, the court held a periodic placement review hearing. Mother appeared, but Father did not appear. DCS reported Mother was making progress in therapy, was addressing substance abuse issues, and was currently employed. Grandmother and Children's Guardian ad Litem ("GAL") reported Children were all on honor roll at their schools, but recommended therapy for R.S. and D.S. The court ordered Children remain in their current placement with Grandmother and ordered individual therapy for R.S. and D.S. The court also authorized unsupervised parenting time for both Parents due to the positive recommendations from DCS, Children's GAL, and service providers.

[15] Sometime in 2015, Mother became pregnant. On May 22, 2015, the court held a periodic review hearing. Parents did not appear. Mother was not engaging in services and was inconsistently participating in drug screenings. Mother's counsel indicated he had not recently had any contact with Mother. Children were doing well in their placement with Grandmother; however Children's

GAL noted the oldest child, Ri.S., Jr., had been upset about Parents' inconsistent participation.

[16]     Beginning in June 2015, Mother's participation in parenting time sessions began to decline "significantly." (Tr. at 38.) On June 26, 2015, the court held a permanency hearing. Mother appeared. Mother had been inconsistent in participating in services and recently had tested positive for cocaine. DCS however, noted Mother had "reengaged fully in services" and was participating in therapeutic visitation sessions with Children on the weekends. (*Id*. at 82.) DCS requested the court set a permanency hearing in ninety days "so that the children may work through with [sic] what a change of plan of permanency may mean." *Id.* Ri.S., Jr. requested "another planned permanent living arrangement" ("APPLA"), but the court denied his request and ordered DCS and Children's GAL to speak with Children regarding guardianship and adoption.

[17]     On August 21, 2015, the court held a permanency hearing. DCS recommended the plan be changed to adoption, as Father was discharged unsuccessfully from home-based therapy, both Parents were inconsistent with parenting time, Mother tested positive for cocaine in May and June, and Mother was unsuccessfully discharged from services due to non-compliance, lack of attendance, and lack of communication. Furthermore, R.S. and D.S.'s home-based therapist stated Children were working through abandonment issues. The court made the following findings:

1. This matter has been open for nearly two years.

2. The DCS has made numerous referrals for both parents to engage in home based therapy, home based case management and drug treatment.

3. Neither parent has engaged in home based services to improve their residence from the deplorable condition which existed when the case was filed.

4. Neither parent has engaged in drug treatment to address their issues of substance abuse. [Mother] has repeatedly tested positive for cocaine.

5. Parents have not maintained consistent parenting time with the children and their time has been reduced to one time per week due to their continued failures to attend parenting time sessions.

   Based on these findings, the Court finds that it is in the children's best interests for the plan to change from reunification to adoption.

(Ex. at 89-90.) The court thus changed the permanency plan from reunification to adoption.

[18] On September 18, 2015, DCS filed its Verified Petition for Termination of Parental Rights of both Parents. The court held an initial hearing on DCS's petition on September 25, 2016, but both Parents failed to appear. On November 6, 2015, the court attempted to hold another pre-trial hearing, but

Parents again failed to appear. Mother's counsel advised the court Mother was on bedrest and her baby was due in January 2016.

[19] On January 15 and 29, 2016, the court held pre-trial hearings. Parents failed to appear at both hearings. Mother's counsel advised the court on January 15 that Mother had given birth in January and was on bedrest.

[20] On February 19, 2016, the court held a periodic review hearing. Mother did not appear, but Father appeared. DCS reported Parents were not participating in services and had been unsuccessfully discharged. DCS also reported the last time Parents had parenting time with Children was January 19, 2016. Mother's counsel advised the court that Mother was in the process of moving to Georgia and that Mother wanted to pursue proceedings for Children to relocate to Georgia and for her cousins in Georgia to have guardianship over Children through an Interstate Compact on the Placement of Children process. The court denied Mother's request because Children were doing well in their placement with Grandmother and had been in that placement for over two years.

[21] On March 31, 2016, the court held a termination hearing on DCS's petition to terminate Parents' parental rights. Parents failed to appear, but both Parents' counsel appeared and requested a continuance because they were able to contact Parents for "the first time" that day. (App. at 74.) The trial court granted the continuance but "admonish[ed] both Mother and Father" for their

failure to maintain contact with counsel and ordered "no further continuances would be granted on their failure to appear." (*Id.* at 75.)

[22] On April 27, 2016, the court held a termination hearing. Parents failed to appear but their respective counsel were present. The court heard testimony from DCS Family Case Manager James McClenning ("FCM McClenning"), DCS Family Case Manager Egypt Pope ("FCM Pope"), and Children's GAL Sandra Donaldson ("GAL Donaldson"). On April 28, 2016, the trial court terminated the parental rights of Parents. The court concluded there was no reasonable probability the conditions resulting in Children's removal or reasons for continued placement outside the home would be remedied as Parents failed to adequately address the conditions of the home throughout the two-and-a-half-year period of the CHINS case, Parents had not recently engaged in services, and Parents had both left Indiana. The court concluded continuation of the parent-child relationship posed a threat to Children's well-being as it would pose a barrier in obtaining permanency for them through Grandmother's adoption. Finally, in light of Children having been placed with Grandmother for the past two and a half years, the stability Grandmother provided them, Children's wishes to remain with Grandmother, and Parents' lack of contact with Children, the court concluded termination was in Children's best interests.

# Discussion and Decision

### *Sufficiency of the Evidence*

[23] "The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children." *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009), *reh'g denied*. Indeed, the parent-child relationship is "one of the most valued relationships of our culture." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). However, these protected interests are not absolute and must be subordinated to the children's interests in determining whether to terminate parental rights. *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*.

[24] "The purpose of terminating parental rights is not to punish parents but to protect their children." *Id.* Therefore, "although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parties are unable or unwilling to meet their responsibility as parents." *Id.* "Termination of parental rights is proper where the children's emotional and physical development is threatened." *Id.* The trial court need not wait until the children are irreversibly harmed such that their physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

[25] To terminate a parent's rights, the State must file a petition in accordance with Indiana Code section 31-35-2-4 and then prove the allegations therein by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260-61. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. I.C. § 31-35-2-8. We review termination of parental rights with

great deference to the trial court.[3] *In re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.* We apply a two-tiered standard of review: we determine first whether the evidence clearly and convincingly supports the findings, and second whether the findings clearly and convincingly support the conclusions. *In re Involuntary Termination of Parent-Child Relationship of R.S.,* 56 N.E.3d 625, 628 (Ind. 2016). We will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re V.A.*, 51 N.E.3d at 1143.

[26] Mother's argument essentially amounts to an assertion that the evidence was insufficient to support the trial court's termination of her rights. In support of her argument, Mother claims the trial court's finding that she was "unsuccessful in all services," (App. at 35), is not supported by the record. She also points to

---

[3]To the extent Mother argues we should apply a different, less deferential standard of review in termination cases, we are unpersuaded. (*See* Appellant's Br. at 8-9) ("the 'deferential' standard of review does not have any legitimate foundation under Indiana Law"). Mother cites *In re Involuntary Termination of Parent-Child Relationship of R.S.,* 56 N.E.3d 625, 628 (Ind. 2016), to support her proposition that "[a]ny 'deference' to a juvenile court termination violates the high bar of scrutiny required by the Court." (Appellant's Br. at 9.) However, Mother misconstrues our Indiana Supreme Court's statement of the law. In *R.S.,* the Court emphasized "the Indiana statute governing termination of parental rights sets a high bar for severing [the] constitutionally protected relationship [between parent and child]." 56 N.E.3d at 628. But the Court also noted in meeting this high bar, "the State must prove each element [of the statute] by clear and convincing evidence" when it files a petition seeking to terminate parental rights. *Id.* at 629. The Court was referring to the high bar that must be met at the trial court level, and not the level of deference on appellate review. Mother's attempt to characterize the Court's statement of the law as applying to appellate review lacks merit. She likewise cannot use *In re V.A.*, 51 N.E.3d 1140 (Ind. 2016), to support her position, as that Court also applied the "clearly erroneous" standard of review. *Id.* at 1143.

DCS testimony from the termination hearing that Children would benefit from continued contact with Parents, and she claims her incarceration and pregnancy complications allowed her insufficient time to adequately address her housing and substance abuse issues.

[27] Mother claims the court's finding that she was "unsuccessful in all services," (App. at 35), is not supported by the record because although Mother was "inconsistent" with services, she was "fully engaged" at times throughout the case. (Appellant's Br. at 9.) However, as the trial court noted, Mother did not complete therapy or case management, and she failed to complete a recommended intensive substance abuse program. Furthermore, Mother completely stopped engaging in services when she moved out of Indiana. While Mother initially made progress in services in early 2015, by May 2015, DCS was reporting Mother's inconsistent participation in services and in drug screenings. By June 2015, Mother's participation in parenting time began to decline "significantly," (Tr. at 38), and by July 2015, Mother was unsuccessfully discharged from services. Regarding Mother's unsuccessful discharge from services, FCM McClenning testified:

> She had numerous appointments in which she was not available for. She either wasn't, either wouldn't be at the place we had arranged to meet or that we simply weren't able to contact her at all. The, there was a compliance agreement put in place, but it was broken and then the final point was an absence on a supervised visitation as well.

(*Id.* at 37) (errors in original). While Mother cites FCM McClenning's testimony from the termination hearing that she established safe housing "at times," (*id.* at 35), and made "significant progress" during her substance abuse therapy sessions, she omits his conclusion that "overall" she did not adequately address her substance abuse issues. (*Id.* at 35-36.) Thus, there is ample evidence in the record to support the court's finding that Mother was unsuccessful in all services.

[28] We are likewise unpersuaded by Mother's argument that she had inadequate time to address her housing and substance abuse issues because of incarceration and pregnancy complications. Mother reasons she "had only a few months to address the serious issues of stable housing and substance abuse," and that she had made "some progress but was not yet ready to be reunified with her family." (Appellant's Br. at 10.) Mother concludes, "this does not mean termination was required." (*Id.*) We disagree.

[29] Mother was released from incarceration in December 2014, and her parental rights were terminated in April 2016. Mother had roughly sixteen months to engage in therapy, home-based case management, drug screens, and parenting time with Children. She failed to do so. We note Mother gave birth in early January 2016, which means Mother became pregnant in the spring of 2015. Mother thereafter continued to use cocaine, as evidenced by her positive drug screening results in May, June, and August 2015. At the August 2015 review hearing DCS requested the permanency plan be changed from reunification to adoption due to Mother's failed drug screenings and failure to engage in

services, but the CHINS case continued for another seven months. Mother failed to appear for any review hearings throughout the remainder of the case and subsequently moved out of Indiana.

[30] In light of Mother's pattern of inconsistent participation throughout proceedings, recorded drug use, and decision to move out of Indiana, we cannot say "time" or Mother's bedrest were at issue. Rather, the record clearly indicates Mother's lack of participation was a result of her own decisions. Mother's assertion that she "was only able to participate in services for about six months before the DCS decided to change the plan to adoption," (Appellant's Br. at 7), is simply not true.

[31] The trial court concluded termination was in Children's best interests, finding termination "would allow them to be adopted into a stable and permanent home where their needs will be safely met." (App. at 35.) Mother argues this finding is not supported by the record, claiming DCS testified "the relationship between [Mother] and her children was beneficial to them" but also that "[Mother's] parental rights should be terminated, and that the court's finding "does not explain the explicit contradiction" in DCS's testimony. (Appellant's Br. at 11.) In fact, DCS's testimony was not contradictory, and Mother mischaracterizes DCS's testimony.

[32] When asked whether continuation of the parent-child relationship posed a threat to the well-being of Children, FCM Pope replied: "I think that the kids are bonded with their parents and they have some sort of a relationship with

their parents, so if they were not able to have any sort of contact with them I think that that would affect them in some sort of way." (Tr. at 62) (errors in original). From this testimony, Mother extracts that the relationship was "beneficial," a word DCS never used. We find this characterization unconvincing. We cannot say the trial court's finding is unsupported just because FCM Pope acknowledged lack of contact with Mother may have a negative effect on Children.

[33] Furthermore, GAL Donaldson testified at the termination hearing that all three children were doing well living with Grandmother and all three were on honor roll at their schools. GAL Donaldson noted Children had been living with Grandmother since November 2013 when the CHINS case began, that Grandmother provided stability, and that Children "loved being there." (*Id*. at 81.) Donaldson noted she had the opportunity to address adoption with Children and Children were in agreement they wanted Grandmother to adopt them. *Id.* She testified she believed Grandmother's permanent adoption of Children was in Children's best interests.

[34] The court's conclusion that termination was in the Children's best interest is thus supported by its findings. And because the court's findings are supported by the record, there is sufficient evidence to support the termination of Mother's parental rights. *See In re T.F.,* 743 N.E.2d at 776 (finding record contained sufficient evidence termination of parental rights was in children's best interests).

[35]     Mother also claims her Due Process rights were violated in the CHINS proceeding because the trial court allegedly erred by: (1) adjudicating Children CHINS without notice to her, and (2) entering a separate, default dispositional decree against her. Thus, she argues, the termination based on this "invalid" dispositional decree was improper. (Appellant's Br. at 13.) Mother failed to raise this issue at any time during the two-and-a-half year course of the CHINS proceeding or the termination hearing, but now claims on appeal the trial court's entering two separate dispositional decrees was such fundamental error that it is grounds for reversal. DCS claims Mother invited any error by avoiding contact with the court. We agree with DCS, and further find no error.

[36]     "A party may not take advantage of an error which he commits, invites, or which is the natural consequence of his own neglect or misconduct. *In re A.D.,* 737 N.E.2d 1214, 1217 (Ind. Ct. App. 2000). "[W]illful, knowing, and voluntary misconduct aimed at manipulating the court system for one's own benefit will not be looked upon with anything resembling favor." *Hawkins v. State*, 982 N.E.2d 997, 1000-1 (Ind. 2013).

[37]     Mother argues she was not afforded notice of the November 22, 2013, fact-finding hearing or opportunity to contest DCS's allegation that Children were CHINS. Mother claims "there was no evidence that [she] was served with notice of this pre-trial hearing or that she was aware that her children could be

adjudicated as CHINS at this hearing." (Appellant's Br. at 12.) The record suggests otherwise.

[38] DCS attempted to contact Mother numerous times and was unsuccessful. The first attempt was made on November 1, 2013, the day DCS removed Children from their home, and then again two days later on November 3. Mother did not appear at the initial detention hearing on November 4, 2013, at which time DCS filed its petition alleging Children were CHINS. Throughout this time, Mother was avoiding any contact with law enforcement because there was an active warrant for her arrest. She subsequently failed to appear for hearings on November 15 and 22, 2013. At the November 22 hearing, DCS informed the court it finally was able to contact Mother, but that she would not tell DCS her location due to the active warrant. Thus, while formal service process had not yet occurred, Mother was aware of the CHINS proceedings and was purposely avoiding the court. We therefore see no error in the court adjudicating the Children CHINS on December 20, 2013, and entering a dispositional decree as to Father.

[39] Mother again failed to appear at the February 28, 2014, review hearing, and was incarcerated in May 2014. On May 30, 2014, the trial court entered a default disposition as to Mother after finding that Mother had been properly served by publication in April 2014 and was incarcerated. In light of Mother's conduct throughout the first six months of this case, we agree with DCS that, to the extent Mother argues any error occurred, she invited this error by evading

contact with DCS and the court.[4] *See In re A.D.,* 737 N.E.2d at 1217 (holding party waived error where party invited error).

[40] In sum, we find Mother's due process claim to lack merit. Finding merit in Mother's argument that she failed to receive notice of the CHINS proceedings would be rewarding her misconduct, which we will not do. Moreover, because Mother was properly served by publication, and later appeared in this case, the trial court's initial default dispositional decree in no way prejudiced Mother's rights. We thus find no error, much less error rising to the level of egregiousness needed to show fundamental error.

# Conclusion

[41] Having concluded the evidence is sufficient to support termination Mother's parental rights to Children and Mother's due process rights were not violated, we affirm the judgment of the trial court.

---

[4]Mother cites *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012), to support the proposition that due process required her to have the opportunity to be heard before the Children were adjudicated CHINS. (*See* Appellant's Br. at 12) ("Where one parent admits that a child is a CHINS the other parent may contest the allegations that the coercive intervention of the court is necessary."). Mother's reliance on *K.D.* is misplaced. In *K.D.,* our Indiana Supreme Court noted a CHINS adjudication "focuses on the condition of the child" and "does not establish culpability on the part of a particular parent." *Id.* at 1256. The court recognized, however, that "situations exist" where the admissions of one parent may not be sufficient to enter a CHINS adjudication, because the other parent may have wished to "challenge that the coercive intervention of the court was necessary," and in those situations, a parent should not be "forced to forgo his or her due process based upon the other parent's admission." *Id.* at 1257. However, the Court acknowledged, alternatively, in situations of absent or unknown parents, it is "critical that DCS properly serve all parties, by publication if necessary, and if the absent parent is not present, a default judgment could be entered." *Id.* Mother's avoidance of the court is precisely the latter situation the Court discussed. *K.D.* does not help mother.

[42]    Affirmed.

Najam, J., and Bailey, J., concur.