# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 14 2016, 10:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jacob A. Venderley
Norris Law Office
Washington, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

James D. Boyer
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the termination of the parent-child relationship of R.Q. and N.Q.:

K.Q. (Mother),
*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

October 14, 2016

Court of Appeals Case No.
14A01-1603-JT-524

Appeal from the Davies Superior Court

The Honorable Gregory A. Smith, Judge

Trial Court Cause No.
14C01-1507-JT-129
14C01-1507-JT-130

**Vaidik, Chief Judge.**

# Case Summary

[1]  K.Q. ("Mother") appeals the termination of her parental rights to N.O. and R.Q. She raises two issues on appeal, whether the trial court's conclusions that (1) the conditions that resulted in the children's removal or placement outside the home will not be remedied, and (2) the termination of the parent-child relationship is in the best interests of the children was clearly erroneous. Concluding that the trial court did not err, we affirm.

# Facts and Procedural History

[2]  Mother has two sons, N.O., born June 6, 2004, and R.Q., born February 14, 2014. In October 2013, police officers from the Washington Police Department dispatched to Mother's residence and found her "warming up narcotics in the microwave" and subsequently arrested her. Tr. p. 134. N.O. was home when the police officers arrived and witnessed Mother attempting to get high. As a result, the Department of Child Services (DCS) did an assessment on Mother and issued a report. On December 17, 2013, Mother was convicted of possession of methamphetamine and neglect of a dependent based on the October incident.

[3]  The very next day, December 18, DCS was called to a hospital because Mother was there talking to "nonexistent voices and believed people were coming through the wall to get her." DCS Exs. 3 & 4. DCS started another assessment

process for Mother and drug tested her on January 10, 2014; she tested positive for methamphetamine, amphetamine, and ephedrine. Mother then gave birth to R.Q. on February 14, and both Mother and R.Q. tested positive for methamphetamine. DCS removed N.O. and R.Q. from Mother that same day. DCS filed a children in need of services (CHINS) petition on February 19, and both children were adjudicated CHINS on April 2.

[4] At a dispositional hearing on May 9, 2014, the court ordered Mother to: participate in recommended programs as scheduled without delay or missed appointments; maintain suitable, safe, and stable housing; secure and maintain a legal and stable source of income; refrain from consuming, manufacturing, trading, distributing, or selling any illegal controlled substance; and provide a safe, secure, and nurturing environment free from abuse and neglect, and be a nurturing caregiver. DCS Exs. 10 & 11.

[5] Mother was initially referred by DCS to the Samaritan Center for a comprehensive evaluation, individual therapy, and home-based case management. DCS continued to work with Mother up to the termination hearing and amended its program recommendations to include a Systematic Assessment of Family Environment (SAFE) assessment, in-patient therapy, psychiatric evaluation, medical injections to deal with her mental-health issues, and case-management services to obtain housing. Mother was also required to check in with the Family Case Manager (FCM) on Mondays, Wednesdays, and Fridays via telephone.

[6] At the first periodic case review on August 27, 2014, the court found that Mother had not been compliant with the May 9 order for missing an appointment for therapy, failing to check in on Mondays, testing positive for illegal drugs on six different dates in just three months, and failing to maintain stable housing. The court held subsequent case reviews on May 12, August 12, and November 23, 2015, and found at each review that Mother had not been compliant with the May 9 order.

[7] During a visit on January 27, 2015, the FCM witnessed Mother get upset with R.Q. for being fussy "so she, basically, kind of threw him onto the ground after that." Tr. p. 231. Mother's visitation rights for both children were terminated on February 6. Visitation was never reinstated due to her continued non-compliance with DCS's recommended services. On May 20, 2015, Mother met with a clinical psychologist and was diagnosed with schizophrenia and a methamphetamine-use disorder. *Id.* at 10. DCS filed a petition to terminate her parental rights to the children on July 2.

[8] At the termination hearing on December 9, 2015, and January 15, 2016, DCS called the FCM, Mother's psychologist, the Court Appointed Special Advocate (CASA), other case workers, and Washington police officers to testify. The FCM testified that Mother continued to be non-compliant with the court's original May 9, 2014 order. The FCM testified that Mother rarely checked in on Fridays as required by DCS; stopped attending therapy from September 2014 until December 2014; stopped meeting with her home-based case manager; missed visits with N.O. and R.Q.; failed random drug tests routinely;

and had upwards of fourteen different addresses between October 2014 and January 2016.

[9] The psychologist testified that Mother was "quite actively psychotic" throughout the psychiatric evaluation, "rambling to herself . . . ." *Id.* at 13. Mother's ramblings were violent, and she "repeatedly made comments about cutting off her baby's head, and that was something she reported several times, and her words at one point were the voices have told her to do that." *Id.* at 13-14. The psychologist diagnosed Mother as schizophrenic and suffering from a methamphetamine-induced psychotic disorder, given her history of hearing voices in childhood and adolescence. *Id.* at 25. The psychologist testified that "[s]chizophrenia is usually a life-long disorder . . . it does not usually go away with treatment." *Id.* at 10. A home-based therapist also testified that Mother told him she "had heard voices since the age of five . . . and only experienced meth in the last year or so . . . ." *Id.* at 148. Both the FCM and the CASA testified that termination is in the best interests of N.O. and R.Q.

[10] On February 12, 2016, the trial court issued an order terminating Mother's parental rights to N.O. and R.Q. The court concluded, among other things, that there is a reasonable probability that the circumstances resulting in the removal of N.O. and R.Q. or the reasons for placement outside the home will not be remedied, that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children, and that termination of the parent-child relationship is in the best interests of the children.

Mother now appeals.

# Discussion and Decision

Mother contends that there is insufficient evidence to support the termination of her parental rights. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence clearly and convincingly supports the trial court's findings and whether the findings clearly and convincingly support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

> (C) that termination is in the best interests of the child[.]

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231.

[14] Mother raises two arguments.[1] First, she argues that the trial court erred in terminating her parental rights when it concluded there is a reasonable probability that the conditions that resulted in N.O.'s and R.Q.'s removal or reasons for placement outside the home will not be remedied.[2] Second, Mother argues that the trial court erred in concluding that termination is in the best interests of N.O. and R.Q.

---

[1] Mother raises a third issue on appeal: whether the trial court's judgment is clearly erroneous because the court did not consider her proposed findings of fact and conclusions. The trial court noted in its order that neither party asked the court for findings of fact and conclusions. However, the trial court sua sponte directed both parties to submit proposed entries. The trial court said in its order, "Having now received the submissions by the parties and having had the matter under advisement and having considered the evidence and testimony now being duly advised in the premises, the Court now enters its findings and order herein." *Id.* Contrary to Mother's claim, there is no evidence that the trial court failed to consider her proposed findings of fact and conclusions when issuing its order.

[2] Mother also argues that there was insufficient evidence to support the trial court's conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the children's well-being. Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires clear and convincing evidence of only one of the circumstances listed in subsection (B). *See R.J. v. Ind. Dep't. of Child Servs.*, 56 N.E.3d 729 (Ind. Ct. App. 2016). Because we conclude that there is sufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in the children's removal will not be remedied, we do not address this argument.

# I. Reasonable Probability That the Conditions Resulting in Removal or the Reasons for Placement Outside the Home Will Not Be Remedied

N.O. and R.Q. were removed from Mother's home due to her mental-health issues and drug addiction. Mother argues that the trial court's ruling is clearly erroneous because "DCS's contention that the conditions would remain is based upon DCS's own failure to provide the proper services so that she would be able to remedy said conditions." Appellant's Br. p. 10.

To determine whether the conditions that resulted in the children's removal or placement outside the home will not be remedied, the trial court engages in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014). First, the court identifies the conditions that led to removal or placement outside the home and then determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing any recent improvements against "habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* Trial courts have discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination, and the court may find that a parent's past behavior is the best predictor of her future behavior. *Id.*

DCS was initially involved with Mother due to a drug-related incident in October 2013 and again investigated Mother after psychotic episode she had in

December 2013. N.O. and R.Q. were removed from Mother after she gave birth to R.Q. in February 2014 and both Mother and R.Q. tested positive for methamphetamine. In May 2014, the court ordered Mother to comply with DCS's recommendations for services. From May 2014 until the termination hearing began in December 2015, DCS referred Mother to multiple services: a comprehensive evaluation, individual therapy, home-based case management, a SAFE assessment, in-patient therapy, a psychiatric evaluation, and case-management services to obtain housing.

[18] The trial court held periodic case reviews on August 27, 2014, and May 12, August 12, and November 23, 2015, and concluded at each hearing that Mother was not compliant with DCS's recommended services. The court entered specific findings of noncompliance at each hearing, including: missing appointments for therapy, failing to check in with the FCM, testing positive for illegal drugs, failing to make medication appointments, failing to maintain stable housing, and failing her random drug screens with the FCM.

[19] The trial court's conclusion that there is a reasonable probability that the conditions resulting in the removal of N.O. and R.Q. or the reasons for placement outside the home will not be remedied is not clearly erroneous.

## II. Best Interests of the Children

[20] Mother's second argument is that the trial court erred in determining that termination is in the best interests of N.O. and R.Q. To determine what is in a children's best interests, the trial court must look to the totality of the evidence.

*In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied.* In doing so, the trial court must subordinate the interests of the parent to those of the children. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* We have previously held that recommendations by both the CASA and the FCM to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the best interests of the children. *Id.* at 1158-59.

Here, both the CASA and the FCM testified that termination is in the best interests of N.O. and R.Q. As we have already addressed, there is sufficient evidence that the conditions resulting in removal will not be remedied. Therefore, the trial court did not clearly err in concluding that termination of parental rights is in N.O.'s and R.Q.'s best interests.

Affirmed.

Baker, J., and Najam, J., concur.