## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 27 2020, 10:26 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
| --- | --- |
| Nicole A. Zelin | Monika Prekopa Talbot |
| Pritzke & Davis, LLP | Deputy Attorney General |
| Greenfield, Indiana | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
| --- | --- |
| In re the Termination of the Parent-Child Relationship of: D.S.D. (Minor Child) and M.D. (Mother) | May 27, 2020 |
| | Court of Appeals Case No. 19A-JT-1578 |
| M.D. (Mother), | Appeal from the Hancock Circuit Court |
| *Appellant-Respondent,* | |
| v. | The Honorable Cody B. Coombs, Court Commissioner |
| Indiana Department of Child Services, | The Honorable R. Scott Sirk, Judge |
| *Appellee-Petitioner* | Trial Court Cause No. 30C01-1901-JT-16 |

**Vaidik, Judge.**

# Case Summary

[1] M.D. ("Mother") appeals the termination of her parental rights to D.S.D. ("Child"). We affirm.

# Facts and Procedural History

[2] Mother and D.D. ("Father") are the biological parents of Child, who was born in 2002.[1] On June 19, 2017, the Department of Child Services (DCS) received a report alleging that Child was being neglected by Mother and that Mother was suffering from an "unidentified mental disorder." Ex. 4. Later that day, Family Case Manager (FCM) John West went to Mother's apartment to interview her and Child. FCM West had also requested the assistance of law enforcement. Officers arrived at Mother's apartment before FCM West and saw that there were "two large butcher knives in the couch." *Id.* Mother "started toward[] the knives and was told to stop." *Id.* When she did not stop, law-enforcement officers "ended up cuffing her." *Id.* Officers detained Mother due to her "erratic behavior and mental instability" and took her to IU Health Methodist Hospital for a mental evaluation. *Id.* At the time, Father was incarcerated, and with no parent or other relatives to take care of her, Child was removed from Mother's care and detained by DCS. Child was fourteen years old at the time of removal. When FCM West spoke to Mother, she said that her ex-husband (Father) and

---

[1] Father signed a consent to Child's adoption and does not participate in this appeal. *See* Tr. Vol. II pp. 6, 80.

his friends "were out to get her." *Id.* She claimed that Father "had connections to the FBI, DCS, EMS, and several other agencies." *Id.* She also said that "she has had many break-ins to her apartment and they have taken all kinds of stuff." *Id.*

[3] Two days later, DCS filed a petition alleging that Child was a Child in Need of Services (CHINS). That day, an initial hearing on the CHINS petition was held, and Mother denied the allegations. She requested the assistance of counsel, and the trial court appointed an attorney to represent her. The trial court also appointed a Court Appointed Special Advocate (CASA) to represent Child and ordered that Child continue to be detained. A fact-finding hearing on the CHINS petition was set for August 2017.

[4] On August 7, the trial court held the CHINS fact-finding hearing and adjudicated Child a CHINS. In September, following a dispositional hearing, the trial court ordered Mother to participate in services, including completing a parenting assessment and psychological evaluation and following all recommendations from the service providers, home-based case management, and supervised visitation. *See* Appellant's App. Vol. II p. 32. Mother was also ordered to execute any necessary releases of information for DCS to monitor her progress with service providers.

[5] That same month, Mother was arrested and charged with Class A misdemeanor criminal trespass in Hancock County.[2] She was also arrested on a warrant out of Marion County for failing to appear for a hearing in a criminal case against her.[3] While Mother was in custody, FCM West "helped facilitate Mother being transported from Marion County Jail to Dr. McIntire so she could facilitate [a] psychological evaluation." Tr. Vol. II p. 92. Dr. McIntire evaluated Mother and diagnosed her with delusional disorder with a subtype that is "primarily persecutory." *Id.* at 25. Dr. McIntire requested that Mother sign a release of information so that she could contact her providers, but Mother refused to do so. *See* Ex. 1. Mother also refused to identify her providers. After meeting Mother, Dr. McIntire submitted her report, recommending that Mother be treated with antipsychotic medication. *See id.* Dr. McIntire noted, however, that Mother does not believe that there is anything wrong with her and therefore was "not going to be amenable to taking" medication. *Id.* If her prediction proved correct and Mother refused medication, Dr. McIntire recommended that a guardianship be explored. If a guardianship was not feasible, then Dr. McIntire noted that Adult Protective Services may need to be involved. Following her evaluation with Dr. McIntire, Mother was returned to jail, where she remained until November 2017.

---

[2] Mother's Hancock County charge was later dismissed by the State.

[3] Mother's Marion County charges are still pending. A jury trial is currently scheduled for September 2, 2020.

[6] For the next year, Mother was somewhat compliant with services. She attended supervised visitation with Child, but visits were often ended early because Mother would discuss the case in front of Child. This upset Child, who would respond by becoming "emotionally withdrawn" and then would "usually stop interacting." Tr. Vol. II p. 57. Mother would also make "accusations of [Child] being brainwashed and manipulated." *Id.* Eventually, visits moved from supervised visitation to therapeutic visits. During therapeutic visits, there were at least three service providers present to help redirect Mother. *See id.* at 69. The last visit Mother had with Child before the court suspended visitation was in July 2018.

[7] In November 2018, visitation was scheduled to occur at a public library. Child arrived early and went looking for FCM West, who was one of the service providers that helped facilitate visitation. She didn't find FCM West but ran into Mother. Child's foster mom said Child then "came out screaming . . . my Mom's after me." Tr. Vol. II p. 78. Child got into her foster mom's car and they drove away. By then, Mother had come running out of the library and chased the car down the road. *See id.* Later that month, the trial court suspended visitation and ordered that Mother was to have no contact with Child. *See* Exs. 14, 16.

[8] In January 2019, DCS filed a petition to terminate Mother's parental rights to Child. A fact-finding hearing was held in April 2019. Dr. McIntire testified that she evaluated Mother in October 2017 and diagnosed her with delusional disorder with a primarily persecutory subtype. Dr. McIntire said that Mother's

ability to parent Child would be affected by her disorder if untreated. Specifically, Dr. McIntire said that "Mother would project her fears onto Child" and that sometimes children raised "by psychotic parents that are persecutory . . . adapt that." Tr. Vol. II, p. 26. Dr. McIntire stated that "[t]here's no other way to treat [Mother's disorder] except for first and foremost with medication." *Id.* at 27. Dr. McIntire explained that Mother would refuse medication "because that's all part of the conspiracy" and that she "did give some contingencies for that in terms of guardianship." *Id.* Home-based therapist James Polly testified that he had been working with Mother since February 2018. Polly said that they met two to three times a week and that he worked with her until February 2019. Polly stated that he told Mother that "she needed to address the mental health concerns because . . . there's doctors and other people that had indicated to DCS that she had them." *Id.* at 33. Polly explained that Mother "did not believe that there was any need for any kind of evaluation or treatment regarding . . . any mental health issues at all. . . . She didn't want to be forced to take meds that she didn't feel like she needed." *Id.* Polly said that Mother "felt like everything was being bugged," and the only progress he made with her was that he built rapport with her. *Id.* at 34. Polly testified that, overall, his referral "was not a success." *Id.* at 37.

[9]     Home-based therapist Michael Doty testified that Child has been his client since September 2017. When he first started working with Child, Doty said that she "was very closed off" and "unable to express herself emotionally." *Id.* at 53. Doty stated that Child has been diagnosed with adjustment disorder with

depressed mood. *See id.* Doty said that now, Child is "doing great," "goal oriented," and "involved in extracurricular activities." *Id.* at 55. Doty also explained that Child said "until about age 9 . . . Mom babied her . . . but between the ages of 10 and 14 Mom became what [Child] described as really abusive." *Id.* Doty said that Child told him that Mother would confine her to her room and that she "felt trapped in her own home." *Id.* Doty testified that Child has told him that she does not see Mother as part of her future and "does not feel the relationship with her Mother is healthy as long as her Mother . . . remains untreated." *Id.* at 56. Cathy Higgins, Mother's mother, testified that Mother has been living with her since June 2017. Higgins said that Mother continues to exhibit "unstable behavior" and she would be concerned if DCS placed Child back with Mother. *Id.* at 61. Higgins stated that it is in Child's best interests to terminate the relationship between Mother and Child. *See id.* at 63.

[10] Keelie Howard, a community mental-health provider, testified that she conducted supervised visits between Mother and Child from July 2017 until July 2018. Howard said that after the first few visits, she "was already recommending therapeutic visitations as visits continuously had to end early," and that "by the end of July," Child "had voiced that she did not want visits." *Id.* at 66. Howard stated there were several times that to get Mother to change her behavior, she "had to threaten to call the police." *Id.* at 67. P.A., Child's foster mother, testified that she intends on adopting Child and that Child is "very well bonded in [her] home." *Id.* at 78. FCM West testified that he had "been managing the entire case . . . since [Child's] removal." *Id.* at 91. FCM

West said that DCS provided services to Mother to help her address her mental-health concerns. FCM West further stated that he believed that he had "done absolutely everything that [he could] do in order to reunify Mother and Child." *Id.* at 93. FCM West said that he believes it is in Child's best interests for Mother's parental rights to be terminated. *Id.* at 94. FCM West explained that Child "has written a letter to the Court . . . that says . . . she does not wish to have visits . . . unless Mother gets the mental health . . . help that she needs." *Id.* at 93-94. FCM West testified that DCS's plan is adoption. *See id.* at 94. After FCM West testified, the court continued the fact-finding hearing to May.

[11] When the fact-finding hearing resumed, Mother testified that Child's best interests "are actually served by being reunified with [her]." *Id.* at 109. Mother stated that she "never failed to feed [Child] or hit her or anything else." *Id.* at 118. Mother said that the entire notion of her having a mental-health problem "is ridiculous." *Id.* at 183. At the end of the hearing, the attorney representing Child's CASA stated that although the CASA could not attend the hearing, she submitted a report to the trial court stating that she believes it is in Child's best interests for Mother's parental rights to be terminated. *Id.* at 187; *see also* Ex. 18. In June 2019, the court issued its order terminating Mother's parental rights.

[12] Mother now appeals.

# Discussion and Decision

[13] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[14] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.Stay

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[15] Mother first challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. In determining whether such a reasonable probability exists, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[16] Here, Mother fails to demonstrate that she is any closer to providing Child a safe, stable home than she was at the beginning of the CHINS case. The trial court found that "Mother has not addressed any of the mental health concerns and Mother continues to exhibit paranoid and/or delusional behavior." Appellant's App. Vol. II p. 42. The trial court concluded that despite being offered numerous services by DCS, Mother did not accept those services, "choosing instead to obsess over paranoid delusions." *Id.* To the extent that Mother argues that DCS did not "obtain medication compliance through the

appointment of a guardian or Adult Protective Services" and that therefore the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied is not supported by evidence, we find no merit to that argument. As the State points out, Mother does not cite any authority for the proposition that DCS is required to pursue guardianship or place a parent in Adult Protective Services as part of its reunification efforts. *See* Appellee's Br. p. 20. As such, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Child's removal and continued placement outside the home will not be remedied.[4]

[17] Mother also challenges the trial court's conclusion that termination is in Child's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* The trial court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be

---

[4] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2) is written in the disjunctive and requires the trial court to find that only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.

remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59.

[18] Here, in addition to Mother's mental-health issues that necessitated DCS involvement and her lack of progress since then, FCM West, Higgins, and Child's CASA all testified that terminating Mother's parental rights would serve the best interests of Child. *See* Tr. Vol. II pp. 63, 94; *see also* Ex. 16. Furthermore, Child's foster mother, P.A., testified that Child is bonded to her foster family and that they plan to adopt her. *See* Tr. Vol. II p. 78; *see also In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term continuous relationships"). Therefore, the trial court did not err when it determined that termination is in Child's best interests.

[19] Affirmed.

May, J., and Robb, J., concur.