## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 12 2019, 10:11 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of D.R., La.R., K.R., and Ly.R., (Minor Children) and N.R. (Father)

N.R. (Father)

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

December 12, 2019

Court of Appeals Case No. 19A-JT-1124

Appeal from the Orange Circuit Court

The Honorable Steven L. Owen, Judge

Trial Court Cause Nos.
59C01-1705-JT-139
59C01-1705-JT-140
59C01-1705-JT-141
59C01-1705-JT-142

**Vaidik, Chief Judge.**

# Case Summary

[1] N.R. ("Father") appeals the termination of his parental rights to his four sons. We affirm.

# Facts and Procedural History

[2] The facts that follow are taken primarily from the trial court's findings of fact, none of which Father challenges on appeal.[1] In 2005, Father was charged with Class B felony sexual misconduct with a minor in Crawford County. *See* 13C01-0506-FB-8. He was later convicted and required to register as a sex or violent offender for life. *See* Tr. Vol. II p. 240.

[3] Father and N.C. ("Mother") (collectively, "Parents") were married in 2008. During the marriage, Parents had four boys: twins, D.R. and La.R., born in 2008; K.R., born in 2012; and Ly.R., born in 2013 (collectively, "Children"). In the beginning of the marriage, Mother was Children's primary caretaker while Father worked outside of the home. Later, Father became Children's primary caretaker while Mother worked outside of the home. Father admits that he used methamphetamine and "pills" while caring for Children. *See* Appellant's Br. p. 9.

---

[1] Because Father does not challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

[4]     In May 2015, Father was charged with Class A misdemeanor theft and Class A misdemeanor possession of a controlled substance. *See* 59D01-1505-CM-435. Then in July, the Department of Child Services (DCS) received a report that two-year-old Ly.R. arrived at an emergency room with a large laceration on his palm and was "covered in human bite marks," "bruises," and "several scratches." Tr. Vol. II p. 121. Family Case Manager (FCM) Gina McDonald investigated and after seeing Ly.R. in the emergency room went to the family's house with police officers. FCM McDonald saw that there were piles of clothes and trash throughout the house, several layers of wallpaper had been ripped off, and pieces of linoleum were missing from the floor. FCM McDonald found that there was one torn mattress in the living room where everyone slept, Children were dirty, and one had a bite mark on his arm. While FCM McDonald was investigating the house, the police found that Parents had outstanding warrants. Parents were then arrested, and Children were detained and placed in foster care.

[5]     DCS opened an Informal Adjustment (IA) to provide the family services, and Children were returned to Parents. Parents were provided a home-based case worker to help them with the conditions of their house. Mother helped clean and organize the house, but Father did not participate in the cleaning and organizing process. The family also received DCS vouchers to get furniture, such as dressers and beds, but out of all the furniture they received Parents only assembled a set of bunk beds.

[6]     In August, Father was charged with two counts of Level 6 felony unlawful possession or use of a legend drug and two counts of Class A misdemeanor possession of a controlled substance. *See* 10C02-1509-F6-1330. Children were with Father when he was arrested. *See* Tr. Vol. II p. 108. Then in September, Father was charged with Level 4 felony child molesting, fondling, or touching with a child under 14; Level 5 felony battery causing bodily injury to a person less than 14 years old; and Level 6 felony battery. The victim was a friend of Father's stepdaughter (Mother's daughter from a prior relationship). *See* 59C01-1509-F1-883. He later pled guilty to the two battery charges, and the child-molesting charge and the August possession-of-drug charges were dismissed. Although Father's child-molesting charge was dismissed, DCS substantiated those allegations against Father. Father admits that the incident occurred in the family home while Children were present. *See* Tr. Vol. II p. 112.

[7]     On September 18, Children were removed from Parents' care due to allegations concerning Father's criminal behavior, Parents' failure to comply with services provided through the IA, "deplorable home conditions," failure to provide Children with proper medical care, and sexual abuse. Appellant's App. Vol. II p. 119. Three days later, DCS filed petitions alleging Children were in need of services (CHINS) due to those allegations.

[8]     A fact-finding hearing on the CHINS petitions was held in January 2016. At the time of the hearing, Father was incarcerated. The trial court found that Children were CHINS and ordered that they continue to be detained. In April,

following a dispositional hearing, the trial court ordered that Parents participate in services. The court also ordered that Parents keep in contact with DCS, communicate any criminal charges, obey the law, and obtain and maintain a legal and stable source of income and housing.

[9] Father was incarcerated in either local jails or the Indiana Department of Correction (DOC) for the majority of time from September 2015 to January 2019. For instance, in September 2016, Father was arrested for violating his probation for failure to register as a sex or violent offender. *See* 13C01-1310-FD-78. Father's probation was revoked, and he was, once again, incarcerated.

[10] Meanwhile, Children had been placed in foster care with D.A. and her family since they were removed in September 2015. When Children first arrived at their foster family's house, they were "almost feral." Tr. Vol. II p. 214. They were "covered in bite marks from head to toe" and lacked communication and social skills. *Id.* at 218-20. Children would throw food at each other and bite each other, and D.R. would "make sexual acts" toward his siblings. *Id.* at 213.

[11] In May 2017, DCS filed petitions to terminate Parents' parental rights to Children. In November 2018, Parents divorced. After numerous continuances, a fact-finding hearing on the termination petitions was held in April 2019. At

the beginning of the hearing, Mother informed the court that she consented to adoption.[2] *See id.* at 55-56.

[12]    FCM Gina McDonald testified that she investigated the family's living conditions in July 2015 and found that the home was in disarray. *See id.* at 131. Parents' home-based case worker, Karen Howson, testified that she began working with the family in June 2015. Case worker Howson said that she went to the family's house on a weekly basis and never saw Father "doing the pick-up" or "cleaning." *Id.* at 143. FCM Kimberly Fletcher testified that she investigated the allegations concerning neglect or abuse of Children in September 2015. FCM Fletcher said that when she arrived at the family's house, the living conditions were "below our minimum standards." *Id.* at 153. FCM Fletcher explained that there "was trash littering the floor, . . . their clothes, shoes, various home items [were] everywhere." *Id.* Regarding the allegations of Father's sexual abuse, FCM Fletcher said that "some of the details the victims [sic] had given, . . . like the bedding . . . matched the description." *Id.* FCM Supervisor Casey Newton testified that before Father was arrested in September 2015, he was not engaged in services provided through the IA. *See id.* at 166. Supervisor Newton said that adoption is the best permanency plan for Children and that their current foster parents want to adopt Children. *See id.* at 166-67. Another FCM Supervisor, Crystal Noble,

---

[2] Because Mother consented to adoption, she does not participate in this appeal.

testified that she believes that termination of Father's parental rights is in Children's best interests. *See id.* at 180. Supervisor Noble said that she is concerned because DCS had "substantiated against [Father] for sexual abuse" of a child that was staying at the home with his stepdaughter. *Id.* at 183.

[13] Joanna Adams, who was employed by Associates in Counseling and Psychotherapies, testified that she works with Children to have appropriate behavior. *See id.* at 194. Adams said that she works with Children to address "anger . . . lashing out, hitting, name calling, [and] saying some pretty hateful things to one another." *Id.* Adams stated that permanency is important for Children because "for them it's very difficult . . . to absorb any major changes . . . they don't understand how to comprehend the information and they act out and they are violent and mean." *Id.* at 196. Children's foster mom, D.A., testified that when Children arrived at her house, K.R. and Ly.R. "just talked in grunts and growls and screams." *Id.* at 203. D.A. said that since Children have been with her family, they are now developmentally on target. *See id.* D.A. also explained that when Children first arrived, they showed behaviors that indicated they had a "lack of attachment" and that D.R. showed some "sexual acting out," which she worked with a therapist to address. *Id.* at 214. D.A. testified that her family wants to adopt Children if they became available for adoption. *See id.* at 204. Court Appointed Special Advocate (CASA) Director Robin Brown testified that she was appointed as Children's CASA in July 2018. CASA Brown said that she believes that termination of Father's parental rights is in Children's best interests. *See id.* at 226. CASA Brown stated that the

"twins [D.R. and La.R.] are really very adamant about not wanting contact" with Father. *Id.* at 227. In June 2019, the trial court issued its order terminating Father's parental rights.

[14] Father now appeals.

# Discussion and Decision

[15] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[16] A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  DCS must prove the alleged circumstances by clear and convincing evidence.  *In re K.T.K.*, 989 N.E.2d at 1231.  If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).

[17]  Father first contends that there is insufficient evidence to support the trial court's conclusion that the conditions resulting in Children's removal will not be remedied.  In determining whether the conditions that resulted in a child's removal will not be remedied, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care.  *In re K.T.K.*, 989 N.E.2d at 1231.  Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied.  *Id.*  "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation."  *Id.*

[18] Here, Father argues that the trial court's "findings focus on historical failures" and therefore the trial court "did not assess the Father's ability to parent the children at the time of the termination hearing." Appellant's Br. p. 21. The evidence shows that Father did not participate in cleaning or organizing the home and did not provide for Children's needs. Therefore, the trial court found that "Father ignored the services offered to him through DCS." Appellant's App. Vol. II p. 120. Moreover, the evidence shows that Father used methamphetamine before his arrest in September 2015 and that while the IA was in place, Father was charged with numerous offenses including child molesting and battery on a person less than fourteen years old. *See* 59C01-1509-F1-883. The trial court found that Father "engaged in . . . criminal acts even when [he] knew or should have known that DCS was closely monitoring [his] behavior." *Id.* It is true that by the termination hearing, Father had been out of incarceration for three months, but the trial court was well within its discretion to weigh more heavily Father's history of being in and out of jail for the past three-and-a-half years. *See In re K.T.K.*, 989 N.E.2d at 1234. Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied.[3]

---

[3] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Children's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationships pose a threat to the well-being of Children. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2) is

[19]     Father also contends that the trial court erred in concluding that termination is in Children's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* The trial court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158-59.

[20]     Here, FCM Supervisors Newton and Noble along with CASA Brown all testified that terminating Father's parental rights is in Children's best interests. *See* Tr. Vol. II pp. 166, 180, 226. Furthermore, the trial court found that "[b]efore removal, [Children] were abused, ignored, and mistreated" and that "[s]ince removal from [Parents] in September 2015, [Children] are doing one thousand (1000) percent better." Appellant's App. Vol. II p. 121. Furthermore, the trial court concluded that Children "have progressed well in placement with [D.A. and her family]; that [Children] are thriving in that placement; that [Children's] needs are met by the Foster Parents; and that [Children] are

---

written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.

bonded to the [Foster Parents]." *Id.*; *see In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships."). Meanwhile, Father has been in and out of jail for the past three-and-a-half years. Finally, Adams testified that permanency is important for Children because "for them it's very difficult . . . to absorb any major changes . . . they don't understand how to comprehend the information and they act out and they are violent and mean." Tr. Vol. II p. 196; *see In re A.D.S.*, 987 N.E.2d at 1159 ("permanency is a central consideration in determining the best interests of a child"). Therefore, the trial court did not err when it determined that termination is in Children's best interests.

[21] Affirmed.

Riley, J., and Bradford, J., concur.