# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 22 2020, 10:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cynthia Phillips Smith
Law Office of Cynthia P. Smith
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of L.J.S. (Minor Child) and R.J.C. (Mother)

R.J.C. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

June 22, 2020

Court of Appeals Case No. 19A-JT-2984

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No. 79D03-1905-JT-64

**Vaidik, Judge.**

# Case Summary

[1] R.J.C. ("Mother") appeals the termination of her parental rights to her son, L.J.S. ("Child"). We affirm.

# Facts and Procedural History

[2] The facts that follow are taken primarily from the trial court's findings of fact, none of which Mother challenges on appeal.[1] Mother and L.S. ("Father") are the biological parents of Child, born in August 2013. Father's parental rights were also terminated, but he does not participate in this appeal; therefore, we limit our narrative to the facts relevant to Mother. Mother also has three other children, A.C., Lu.S., and J.C., who are not the subject of this appeal and were not part of the underlying termination proceedings.[2]

[3] On June 1, 2016, the Department of Child Services (DCS) received a report alleging that Child and his three siblings were left alone in a car, that the children were dirty, and that the youngest sibling, who was an infant at the time, had "a diaper full of feces." Tr. p. 90. The next day, DCS received a second report, this time alleging that Mother was using methamphetamine. Later that day, DCS went to Mother's house and found the home to be "below

---

[1] Because Mother does not challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

[2] A guardianship was established for A.C., Mother consented to Lu.S. being adopted by his foster parents, and J.C. was reunified with her father. *See* Appellant's App. Vol. II pp. 10-11.

minimum standards." *Id.* The lock on the entry door did not work, so Mother and her oldest child had to climb "onto the roof going through a window to open the door." *Id.* There was "a lack of food in the home," the children did not have beds, and the room where the children slept had "exposed insulation" and "holes in the walls." *Id.* DCS also saw that there were steak knives easily accessible and that there was "one steak knife that was lying blade up on the floor." *Id.* DCS learned that Mother had been convicted of welfare fraud and was currently on house arrest. Mother tested positive for and admitted smoking methamphetamine. Child and his three siblings were removed from Mother's care and detained by DCS. Thereafter, Mother was sent to work release due to her positive test for methamphetamine.

[4] A few days later, DCS filed petitions alleging that Child and his siblings were Children in Need of Services (CHINS). An initial hearing on the CHINS petitions was held that day, and Mother admitted the allegations. The court also appointed a Court Appointed Special Advocate (CASA) to represent Child and ordered that Child and his siblings continue to be detained. In July, Mother met her now-husband, N.B. She met him through a mutual friend referred to as "Uncle Skip." Appellant's App. Vol. II p. 12. Uncle Skip was a registered sex offender. Two weeks after meeting, Mother learned that N.B. had been convicted of Class B felony child molesting in 2013 and was required to register as a sex offender through 2026. Despite learning this information, Mother chose to continue her relationship with N.B.

[5] In September, following a dispositional hearing, the trial court ordered that Mother engage in the following services: parenting, substance-abuse, and mental-health assessments; medication management; individual counseling; domestic-violence education; home-based case management; random drug screens; and supervised visitation. *See id*. at 10.

[6] Mother completed a substance-abuse assessment in October. She was diagnosed with methamphetamine-use disorder and adjustment disorder with anxiety. That same month, Mother also completed a mental-health assessment. Mother reported feeling "scattered" but better when medicated, although she declined medication. *Id.* at 12. She disclosed a history of anxiety and depression and admitted that she used methamphetamine for about four months but had stopped. It was recommended that Mother complete parenting and domestic-violence assessments, continue case management, and participate in individual counseling. Regarding individual therapy, Mother participated for approximately three months; however, during those three months, she failed to attend half of her scheduled appointments. Mother also participated in supervised visitation. From the start, Mother was unable to manage all four children. The children ran into the street, were dirty and underdressed, did not respect boundaries, and treated animals "roughly." *Id.* at 12.

[7] In January 2017, Mother completed a parenting assessment. During the assessment, Mother was observed being overwhelmed with all four children, having difficulty maintaining focus and remaining calm, and struggling with discipline. It was recommended that Mother participate in parenting education.

However, she only "intermittently" participated. *Id.* at 12. In February, the trial court admonished Mother for ongoing contact with registered sex offenders and ordered her to ensure that Uncle Skip and any other registered sex offenders did not have contact with her children. *See id.* at 13; *see also* Ex. 1.

[8] By September 2017, Mother requested to stop all services. She told DCS she was "done" and that "she was pregnant and planned to name the baby Chance because he would be her second chance to be a good mother."[3] Appellant's App. Vol. II p. 11. In October, Mother signed documents consenting to Child being adopted, and Mother and Child had a "goodbye visit." *Id.* Two months later in December, a permanency hearing was held, and the trial court changed Child's permanency plan to adoption. Thereafter, DCS filed a petition to terminate Mother's parental rights on December 1.

[9] On December 27, the court granted Mother's motion to set aside her consent to Child's adoption because her attorney had not been contacted regarding Mother signing the consent. In February 2018, however, Mother signed a second set of documents consenting to Child being adopted, and this time her attorney was present when she signed the consent. Thereafter, DCS dismissed its petition for termination of Mother's parental rights. In April, Mother married N.B., and in May, she agreed to have no contact with Child or his prospective adoptive family (who were at the time also Child's foster family).

---

[3] Mother later gave birth to her fifth child who she did in fact name "Chance." *See* Tr. p. 153.

[10] Ultimately, Child's prospective adoptive family decided not to adopt him, and Child was removed from that placement and placed in another pre-adoptive foster home in September 2018. In January 2019, DCS filed a second petition to terminate Mother's parental rights. That petition was dismissed in May for failure to commence the trial in a timely manner. Later that month, DCS filed a third petition to terminate Mother's parental rights.

[11] The termination fact-finding hearing was held in August 2019. Therapist Marla Rausch testified that she conducted Mother's parenting assessment in January 2017 and found that Mother was "overwhelmed." Tr. p. 28. Therapist Rausch said that Mother would "bribe the children" to get them to stop running around and "grabbed one of the kids by their arm to get them out of a room because they wouldn't listen to her." *Id.* Therapist Rausch recommended that Mother participate in parent education. Counselor Jillian Hough testified that Child had been her client since January 2019 and that he had been diagnosed with post-traumatic stress disorder. *See id.* at 60. Counselor Hough said that Child "identified that his biological mom is not . . . a part of his life and that he has attached to the current foster parents and has hopes of remaining in their home." *Id.* at 54. Counselor Hough believed that it is in Child's best interests to continue in his current foster home and not to reintroduce Mother as there would likely be "a regression in [Child's] behavior and [in his] overall mental health." *Id.* at 53. Visitation facilitator Patricia Wilkerson testified that in the eight months that she supervised visitation, Mother made "very little" progress in addressing DCS's parenting concerns. *Id.* at 65. Wilkerson said that at one

point, Mother brought N.B. to a visit and told her that "he would be part of children's lives and she wanted him to come to the parenting time." *Id.* at 72. Wilkerson stated that she told Mother that N.B. was not allowed to attend visits because he was on the sex-offender registry. *See id.*

[12] Family Case Manager (FCM) Joyce Fasani testified that in September 2017, Mother requested that all services stop. *See id.* at 115. FCM Fasani said that Mother had not engaged in services, contacted DCS to request services, or visited Child since she signed the first consent to Child's adoption in October 2017. FCM Fasani stated that there were other issues keeping Child from being returned to Mother's care, including that he had "stuck his finger up another child's anus," "has attachment disorder," "has PTSD," and is "just beginning to heal," and that Mother is "married to a registered sex offender" and that "would put [Child] in a terrible position not only emotionally but physically." *Id.* at 115. FCM Fasani explained that Mother "has co-dependency and the co-dependency is focused on the man that she is with. She will do what that man tells her to do, and they, that person will come before her children and we've seen this pattern repeatedly." *Id.* at 123. FCM Fasani believed it is in Child's best interests for him to be adopted by his pre-adoptive foster parents. *See id.* at 128. CASA Christy Burrows testified that she was appointed as Child's advocate in November 2016. CASA Burrows said that since Child had been placed with his most recent pre-adoptive family, he was "doing very well . . . better than [she'd] ever seen him do . . . he's stable, happy, healthy, achieving well in school." *Id.* at 148. CASA Burrows believed it is in Child's best interests

to be adopted by his current foster family. *See id.* Mother testified that she signed a consent for Child to be adopted twice and that the second time, it was the prospective adoptive parents who changed their mind, not her. *See id.* at 176. Mother also said that she broke up with N.B. in February 2017 but got back together with him after she "stopped doing all services" in November 2017. *Id*. at 161. Mother admitted that the last time she contacted DCS about doing services was in November 2017. *See id.* at 162. In November 2019, the trial court issued its order terminating Mother's parental rights.

[13]     Mother now appeals.

# Discussion and Decision

[14]     When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

[15]     A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[16] Mother contends that there is insufficient evidence to support the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal will not be remedied. In determining whether such a reasonable probability exists, the trial court engages in a two-step analysis. First, the trial must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will

not be remedied. *Id.* "The trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.*

[17] Here, Mother has not demonstrated that she is any closer to providing Child a safe, stable home than she was at the beginning of the CHINS case. The trial court found that Mother "voluntarily ceased all services, voluntarily ceased all contact, and consented to [Child's] adoption twice." Appellant's App. Vol. II p. 14. The trial court concluded that Mother "also fails to grasp future trauma likely to result from efforts toward reunification after nearly two (2) years of Mother's chosen absence." *Id.* at 13. Moreover, Mother's chosen absence and voluntarily cessation of services are further evidence of Mother's co-dependency issues and of her always placing the needs of the man she is with before those of her children, as witnessed by FCM Fasani. *See* Tr. p. 123. Finally, Mother admitted that she had not visited Child since the fall of 2017 and did not contact DCS to reengage in visits at any time after. *See id.* at 161-62; *see also In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002) (finding that failing to exercise the right to visit one's children demonstrates a lack of commitment to complete the actions necessary to preserve the parent-child relationship). Accordingly, the trial court did not err when it concluded that there is a

reasonable probability that the conditions resulting in Child's removal and continued placement outside Mother's home will not be remedied.[4]

[18] Next, Mother challenges the trial court's conclusion that termination is in Child's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parents to those of the child. *Id.* A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that their physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re A.D.S.*, 987 N.E.2d at 1158-59.

[19] Here, in addition to Mother's parenting issues that necessitated DCS involvement and her lack of progress since then, FCM Fasani, CASA Burrows, and Counselor Hough all testified that terminating Mother's parental rights and

---

[4] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in Child's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Child. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (B) has been established by clear and convincing evidence), *trans. denied*.

adoption would serve Child's best interests. Furthermore, CASA Burrows testified that since Child has been placed with his most recent pre-adoptive family, he is "doing very well . . . better than [she'd] ever seen him do . . . he's stable, happy, healthy, achieving well in school." Tr. p. 148; *see also In re K.T.K.*, 989 N.E.2d at 1230 (finding that "children have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term continuous relationships"). As such, the trial court did not err when it concluded that termination is in Child's best interests.

[20] Affirmed.

May J., and Robb, J., concur.