## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 29 2020, 11:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

A. David Hutson
Hutson Legal
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of: E.G. and M.R. (Minor Children) and M.G. (Mother)

M.G. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner*

July 29, 2020

Court of Appeals Case No. 19A-JT-2331

Appeal from the Clark Circuit Court

The Honorable Vicki Carmichael, Judge

The Honorable Joni Grayson, Magistrate

Trial Court Cause Nos. 10C04-1906-JT-30 10C04-1906-JT-31

**Vaidik, Judge.**

# Case Summary

[1] M.F.G. ("Mother") appeals the termination of her parental rights to two of her sons. We affirm.

# Facts and Procedural History

[2] The facts that follow are taken primarily from the trial court's findings of fact, none of which Mother challenges on appeal.[1] Mother is the biological parent of M.R., born in 2014, and E.C.G., born in 2015 (collectively, "Children").[2] Mother has a third child, M.M. ("Sibling"), who was removed from her care at the same time as Children. Since then, Sibling's father has been granted full custody, and therefore Sibling is not a subject of this appeal. *See* Tr. p. 45.

[3] In October 2015, the Department of Child Services (DCS) received a report that six-month-old E.C.G. had been admitted to Kosair Children's Hospital in Louisville "due to bleeding on the brain and multiple bruises on his right temple, left ribcage, back, and knees."[3] Ex. 4. In addition to the bruising, medical providers observed that E.C.G. was dirty, had severe diaper rash, and

---

[1] Because Mother does not challenge the trial court's findings of fact, we accept them as true. *See Maldem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

[2] E.C.G.'s father is unknown, and no one had sought to establish paternity by the time of the termination hearing. *See* Appellant's App. Vol. II p. 12. M.R.'s alleged father was served by publication but never appeared in the CHINS or termination proceedings, and no paternity action had been filed by the time of the termination hearing. *See id.* at 26.

[3] Kosair Children's Hospital was renamed "Norton Children's Hospital" in 2016.

was malnourished. Emergency surgery was required to address E.C.G.'s brain injury, and doctors placed a shunt in E.C.G.'s head to relieve the pressure on his brain. E.C.G. would remain in the hospital for the next six months, recovering from his near fatal injuries. *See* Tr. p. 37.

[4] Family Case Manager (FCM) Lynelle Amstutz was assigned to investigate and spoke with Mother about E.C.G.'s injuries. Mother initially told FCM Amstutz that "the bruising that was on [E.C.G.'s] right temple was caused by [Sibling], by that child hitting [E.C.G.] with a hard, plastic toy several days earlier." *Id.* Mother then gave FCM Amstutz conflicting stories as to who had been caring for E.C.G. in the days leading up to his hospitalization, saying at one point "that she had been the only person that had been alone with [E.C.G.] for several days," but at another point saying "that grandma had . . . been the only person with [E.C.G.] for several days." *Id.* Mother later told FCM Amstutz that she "did not know where [E.C.G.'s] injuries or bruising had come from." *Id.* During her assessment, FCM Amstutz also learned that Sibling had been seen at the same hospital two weeks before E.C.G. was admitted and was observed as having bruising on his body. *See* Ex. 4. Children and Sibling were removed from Mother's care on October 5, and a no-contact order was put in place between Mother and E.C.G. Later, a forensic medical examination concluded that E.C.G.'s injuries were consistent with intentional physical abuse.

[5] On October 7, DCS filed petitions alleging Children to be Children in Need of Services (CHINS). In December, the State charged Mother with Level 3 felony battery resulting in serious bodily injury to a person less than fourteen years old,

Level 3 felony neglect of a dependent resulting in serious bodily injury, Level 5 felony battery on a person less than fourteen years old, and Level 5 felony neglect of a dependent resulting in bodily injury. She was incarcerated from December 2015 to January 2017. While incarcerated, Mother admitted that Children were CHINS and agreed to participate in services. Mother ultimately pled guilty to two counts of Level 5 felony neglect of a dependent resulting in bodily injury and was sentenced to six years, with one-and-a-half years executed and four-and-a-half years suspended to probation. *See* Ex. E.

[6] During the year following her release in January 2017, Mother was somewhat compliant with services. In February 2017, Mother began supervised visits with Children. Visits did not go well, and visitation supervisors often observed Mother "sitting on the couch or on her phone, rather than interacting with [Children] during visits." Appellant's App. Vol. II p. 15. Eventually, visits were changed from supervised visitation to therapeutic visits. During therapeutic visits, Mother received "one-on-one direction in real time as issues would arise during the visits." *Id.* However, Mother's parenting skills did not improve, and visits were eventually suspended "[d]ue to the detrimental effect the visits were having on [Children]." *Id.* at 16.

[7] In March 2018, the trial court ordered that Children's permanency plan be changed from reunification to termination and adoption. Thereafter, DCS filed petitions to terminate Mother's parental rights to Children. A month later, DCS agreed that it would dismiss the pending termination case if Mother agreed to seek mental-health treatment and medication management, to follow all

recommendations from a psychological assessment, and to continue in all current therapy services. *See* Ex. 5. Mother agreed to those terms, and DCS dismissed the termination case. However, by October 2018, the trial court once again found that Mother was not consistently participating in services and ordered that Children's permanency plan be changed from reunification to termination and adoption. In December 2018, DCS again filed petitions to terminate Mother's parental rights to Children. Those petitions were later dismissed due to statutory-timeliness issues.

[8]     In June 2019, DCS filed a third set of petitions to terminate Mother's parental rights to Children. A fact-finding hearing was held in August. FCM Amstutz testified that after serving as the assessment case manager, she continued managing the case until September 2016. She explained that Mother was incarcerated the entire time that she was managing the case but was able to participate in some services while in jail. Specifically, Mother participated in case management and therapy and completed a psychological evaluation.

[9]     FCM Angela Johnson testified that she took over as the family's case manager in February 2018. FCM Johnson said that Mother had not maintained stable housing and lived in at least five different places: Mother's grandparents' house, Mother's mother-in-law's house, a mobile home, and two different hotel stays. Tr. p. 133. Regarding employment, FCM Johnson stated that Mother was "not interested in being employed right now. That she [was] going to . . . online classes." *Id.* at 135. FCM Johnson explained that DCS had given Mother "every opportunity that [she felt] a mother could be given to work towards

reunification" and that there were not any services that DCS had at its disposal that were not offered to Mother. *Id.* at 135-36. FCM Johnson said that Children need a stable, appropriate, safe, nurturing, consistent, healthy living environment and that she did not believe Mother could provide that. *See id.* at 138. FCM Johnson believed that it is in Children's best interests for Mother's parental rights to be terminated. *See id.* at 139.

[10] Mary Louise Watkins testified that she was referred to provide Mother with parenting classes in October 2018. Watkins said that Mother completed an initial intake in November 2018 but then did not show up for her first class. *See id.* at 58-59. Watkins stated that she tried texting and calling Mother but never got a response. Watkins explained that after missing the first class, Mother needed to have contacted her before the second class began in order for Mother to stay in that parenting-class program. *See id.* at 60-61. Watkins said that the program was set up so that one class builds on the other and if Mother missed more than one class, she would have to wait until the next parenting-class program began approximately three months later. *See id.* Watkins testified that each time she started a new parenting-class program she would reach out to Mother and tried for three months to contact Mother but never received a response. *See id.* at 61, 67.

[11] Therapist Nina Fox testified that she was referred to provide Mother with home-based therapy in March 2016. Therapist Fox said that initially she met Mother once a week at the Clark County Jail, and once Mother was released, she met Mother once a week at her house. *See id.* at 70. Therapist Fox stated

that Mother "moved quite a number of times. Initially, she was staying with her grandparents. And then she moved from there several times." *Id.* at 70. Therapist Fox also said that after Mother was released, "her focus changed in therapy. She was not as engaged. It was difficult to get her to meet [and] towards the end[,] [i]t became more of [Therapist Fox] driving around, trying to find her." *Id.* at 72. Therapist Fox explained, regarding Mother's change in focus, that "[s]he was a little bit more interested in reconnecting with outside individuals, males in particular," and that Mother's "mind set was she was grown and she could do with her life what she wanted to do." *Id.* at 73. Therapist Fox said that her therapeutic relationship with Mother ended in May 2018, after Mother missed several appointments. *See id.* at 73. Therapist Fox testified that during the two years she worked with Mother she did not make progress toward being a better parent. *See id.* at 75.

[12] Stacey Marie Capps testified that she supervised visits for Mother and Children for over a year. Capps said that Mother attended forty-three visits and cancelled six, and that most of the visits were "poor." *Id.* at 80. Capps explained that "there was a lack of bond, parental bond, between [Mother] and [Children,] especially E.C.G. E.C.G. cried hysterically for the first several months each week at the visits. . . [M.R.] absolutely did not want to be there. There was no parental bond with either child. Lack of supervision. Lack of structure." *Id.* at 82. Capps stated that Mother's discipline methods of "yelling and time out" were not appropriate for Children, and that often "what should have been a two (2) or three (3) minute time out ended up stretching into fifteen (15) minutes."

*Id.* Capps testified that her involvement ended in May 2018 when visits moved to a therapeutic setting. *See id.* at 81. Capps said that of the forty-three visits she supervised, "none" was a positive experience for Children. *Id.* at 88. Therapist Jerri Whitworth testified that she provided therapeutic visits for Mother and Children from July 2018 until April 2019. Therapist Whitworth said that Mother attended twenty-eight visits and "cancelled or no-showed" eighteen visits. *Id.* at 94. Therapist Whitworth stated that therapeutic visits occurred twice a week, one visit per child, for four hours each. *See id.* at 92. Therapist Whitworth explained that Children's visits were separated because Mother was not "able to handle both Children at the same time." *Id.* Therapist Whitworth said that she would "walk [Mother] through things to do" to manage Children's behaviors, but "nothing carried over to the next visit" and every visit they'd "just kind of start from scratch." *Id.* at 93. Therapist Whitworth testified that based on her observations, she did not believe that Mother "has the ability to parent [Children] on her own." *Id.* at 96.

[13] Caseworker Gayle Bibb testified that she provided home-based case work and supervised visits to Mother. Bibb said that she met initially Mother in jail and worked with her to establish goals for when she was released. Bibb stated that Mother's goals were to improve her parenting skills, gain employment, and maintain stable housing. *See id.* at 103. Bibb said that since Mother was released, she had not had trouble getting a job, but maintaining employment was an issue. *See id.* at 105. Bibb explained that Mother had "several" jobs in the two-and-a-half years, but none lasted longer than "at the very best, three (3)

months." *Id.* Bibb stated that Mother was no longer looking for employment but was focusing on school and attending school online for photography. *See id.* at 115. Regarding housing, Bibb said that Mother had moved "approximately five (5) to six (6)" times in two-and-a-half years and was currently living with her mother-in-law and new husband. *Id.* at 106. Bibb stated that she had visited the mother-in-law's house and saw that there were two bedrooms, but that Mother was sleeping on the couch. *See id.* Bibb testified that since she began working with Mother in 2016, Mother had not made any consistent progress toward reunification. *See id.* at 118.

[14] Therapist Susan Marie Robinson testified that she provided therapy to Children. Therapist Robinson said that M.R. was referred for therapy in February 2018 for "very aggressive behavior." *Id.* at 14. Regarding E.C.G., Therapist Robinson said that he was referred for therapy in March 2019, for "pretty major tantruming behavior and because of the history of traumatic brain injury that [she] felt like needed further evaluation." *Id.* Therapist Robinson said that her initial therapy sessions with Children followed their supervised visits with Mother and that after visits Children "were usually either very, very quiet or what [she] would call very, very disorganized, having trouble, kind of, coming into the office and settling down to begin the work [they] were trying to do." *Id.* at 18. Therapist Robinson testified that Children "voiced, on more than one occasion, that they didn't want to go to the visits." *Id.* at 19. Therapist Robinson stated that since visits with Mother were suspended, Children "have been happier, calmer, more peaceful, smiling, laughing more, talking about

things that are important in their lives right now, like school and various activities." *Id.* at 19-20. When asked whether Children talked about Mother during therapy, Therapist Robinson said, "They do not talk about her at all." *Id.* at 20. Therapist Robinson believed that it is in Children's best interests for Mother's parental rights to be terminated so that Children "can continue moving forward and growing into happy, health human beings." *Id.* at 26. When asked why, Therapist Robinson said that in order to recover from their past trauma, Children need consistency, stability, unconditional love, "confidence that [their] parent is going to be there for them," and engagement, and that she did not believe that Mother could provide those things for Children. *Id.* at 29.

[15] Children's foster mother, M.A.M., testified that Children "are the two (2) most important people in [her family's] life right now." *Id.* at 122. M.A.M. said that if Mother's parental rights were terminated, she and her family would want to adopt Children. M.A.M. said that Children did not speak about Mother "unless something triggers their memory," such as when M.R. asked for a soda and M.A.M. said no, M.R. said that "his other mommy would let him have soda." *Id.* at 124. Court-Appointed Special Advocate (CASA) Shannon Holt testified that Children "have waited an extremely long time for permanency" and that she believed it is in Children's best interests for Mother's parental rights to be terminated. *Id.* at 152. In December 2019, the trial court issued its order terminating Mother's parental rights.

[16] Mother now appeals.

# Discussion and Decision

Mother contends that the evidence is insufficient to support the trial court's order terminating her parental rights to Children. When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re K.T.K.*, 989 N.E.2d 1225, 1229 (Ind. 2013). Rather, we consider only the evidence and reasonable inferences that are most favorable to the judgment of the trial court. *Id.* When a trial court has entered findings of fact and conclusions of law, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* To determine whether a judgment terminating parental rights is clearly erroneous, we review whether the evidence supports the trial court's findings and whether the findings support the judgment. *In re V.A.*, 51 N.E.3d 1140, 1143 (Ind. 2016).

A petition to terminate parental rights must allege, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *In re K.T.K.*, 989 N.E.2d at 1231. If the court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[19] Mother first challenges the trial court's conclusion that there is a reasonable probability that the conditions resulting in Children's removal will not be remedied. In determining whether such a probability exists, the trial court engages in a two-step analysis. First, the trial court must ascertain what conditions led to the child's placement and retention in foster care. *In re K.T.K.*, 989 N.E.2d at 1231. Second, the trial court determines whether there is a reasonable probability that those conditions will not be remedied. *Id.*

[20] Here, Mother has not demonstrated that she is any closer to providing Children a safe, stable home than she was at the beginning of the CHINS case. The trial court's unchallenged findings on this issue support its conclusion that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside Mother's care will not be remedied. *See, e.g.*, *In re E.M.*, 4 N.E.3d 636, 644 (Ind. 2014) (findings regarding father's non-compliance with services support trial court's conclusion that there is reasonable probability that conditions resulting in children's removal would not

be remedied). The trial court found that "DCS has provided ample opportunities and substantial services to [Mother], yet she still has not maintained a stable home where [Children] can live, and has not achieved any financial stability or independence." Appellant's App. Vol. II p. 17. The trial court further concluded that "[Mother] has failed to maintain contact with the FCM; missed appointments and visits; has been unwilling or unable to deal with or remedy her parenting problems[; and] has been unable to 'carry over' the information and skills imparted to her by service providers from session to session." *Id.* at 18-19. Accordingly, the trial court did not err when it concluded that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied.[4]

[21] Mother also challenges the trial court's conclusion that termination is in Children's best interests. To determine what is in the child's best interests, the trial court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. In doing so, the trial court must subordinate the interests of the parent to those of the child. *Id.* The trial court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* When assessing the child's physical, emotional,

---

[4] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied, we need not address its alternate conclusion that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of Children. *See In re A.G.*, 45 N.E.3d 471, 478 (Ind. Ct. App. 2015) (Indiana Code section 31-35-2-4(b)(2) is written in the disjunctive and requires the trial court to find only one of the two requirements of subsection (b) has been established by clear and convincing evidence), *trans. denied*.

and mental well-being, the trial court may consider a myriad of factors. *In re K.T.K.*, 989 N.E.2d at 1235. Among those factors contemplated, "permanency is a central consideration in determining the child's best interests." *Id.*

[22] Here, the trial court found that Mother moved several times and did not find permanent and stable housing. *See* Appellant's App. Vol. II p. 14. At the time of the termination hearing, Mother was living with her mother-in-law, sleeping on her couch, and there was no room for Children in the house. Additionally, the trial court found that Children "do not have a healthy bond to their mother," that E.C.G. "continues to have special needs due to the severe injuries he suffered as an infant," and that "[d]espite the one-on-one instruction by multiple service providers, [Mother's] parenting skills did not improve." *Id.* at 16. The trial court concluded that the CHINS case had been pending for nearly four years, that Children need stability and permanency, and that it was time for permanency to be achieved for Children. *See id.* at 19. In addition to the trial court's findings and conclusions, FCM Johnson, Therapist Robinson, and CASA Holt all testified that terminating Mother's parental rights is in Children's best interests. *See* Tr. pp. 26, 139, 152. As such, the totality of the evidence supports the trial court's conclusion that termination is in Children's best interests.

[23] Affirmed.

Baker, J., and Bailey, J., concur.